# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| REBEKAH CHARLESTON; ANGELA DELGADO-WILLIAMS, <br><br>         Plaintiffs-Appellants, <br><br> and LEAH ALBRIGHT-BYRD, <br><br>         Plaintiff, <br><br> v. <br><br> STATE OF NEVADA; et al., <br><br>         Defendants-Appellees. <br> ———————————————— <br> LANCE GILMAN; et al., <br><br>         Movants. <br> ———————————————— | No. 19-17423 <br><br> D.C. No. 3:19-cv-00107-MMD-WGC <br><br> District of Nevada, Reno |

On Appeal from a Judgment in a Civil Case granting Defendants' Motions to Dismiss (ECF No. 22,31)
U.S. District Court for Nevada (Reno)
Honorable Miranda M. Du, Chief United States District Judge

## APPELLANTS' OPENING BRIEF

Jason D. Guinasso (Bar No.8478)
HUTCHISON & STEFFEN, PLLC
500 Damonte Ranch Parkway, Suite 980
Reno, NV 89521
Phone: 775.853.8746
Fax: 775.201.9611
jguinasso@hutchlegal.com
*Counsel for Appellants*

## LIST OF ALL APPELLANTS

Rebekah Charleston, Individual

Angela Delgado Williams, Individual

## <u>CORPORATE DISCLOSURE STATEMENT</u>

This statement is provided pursuant to Fed. R. Appellate P. 26.1.

There are no nongovernmental corporation appellants in this case. Both appellants are individuals.

# **TABLE OF CONTENTS**

I.    JURISDICTIONAL STATEMENT ...................................................... 8

   A.  Jurisdiction for the Appeal. ...................................................... 8
   B.  Timeliness of the Appeal. .......................................................... 8

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................... 9

III.  STATUES AND REGULATIONS .................................................... 9

IV.   STATEMENT OF THE CASE ......................................................... 9

   A.  Factual Background.................................................................... 10
     1.  Appellants' Experience of Sex Trafficking ............................ 11
       a. Rebekah Charleston.................................................. 11
       b. Angela Delgado-Williams........................................... 12
       c. Leah Albright-Byrd .................................................. 13
     2.  Nevada's Laws Protecting the Sex Trade ............................. 14
     3.  Federal Law on the Sex Trade and Sex Trafficking ................ 19
   B.  Procedural History.................................................................... 21

V.    SUMMARY OF ARGUMENT ........................................................ 23

VI.   ARGUMENT ............................................................................. 24

   A.  Standard of Review ................................................................... 24
   B.  Appellants Have Pled Sufficient Facts to Show They Were Injured by Being Trafficked for Sex .................................................................... 26
   C.  Appellants Have Pled Sufficient Facts to Show Their Sex Trafficking is Traceable to Nevada's Protection of the Sex Trade ............................. 29
   D.  Appellants Have Pled Sufficient Facts to Show Their Sex Trafficking Injuries Can Be Redressed by Declaratory Relief and Survivor-Focused Resources ................................................................................ 32

VII.  CONCLUSION .......................................................................... 36

CERTIFICATE OF COMPLIANCE....................................................... 37

CERTIFICATE OF RELATED CASES .................................................. 38

# TABLE OF AUTHORITIES

*Cases*

*Bailey v. State of Alabama*, 219 U.S. 219, 227 (1911) _____ 29, 30, 31, 32

*Bailey v. State of Alabama*, 219 U.S. 219, 227-28 (1911) _____ 30

*City of Reno v. Reno Police Protective Ass'n*, 98 Nev. 472, 475, 653 P.2d 156, 158 (1982) _____ 15

*Coyote Publishing, Inc. v. Miller*, 598 F. 3d 592, 596 fn2 (2010) _____ 17

*Doe v. Gallinot* (9th Cir. 1981) 657 F2d 1017 _____ 33

*Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981) _____ 8

*Id.* at 238 _____ 30

*Id.* at 244–45 _____ 31

*Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) _____ 25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992) _____ 27

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 _____ 33

*Mechling Barge Lines v. United States*, 368 U.S. 324, 331 (1961) _____ 33

*MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 126 (U.S., 2007) _____ 33

*Moeller v. Taco Bell Corp.*, 816 F.Supp.2d 831, 849 (N.D.Cal., 2011) _____ 26

*Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003) _____ 25

*Public Service Commission v. Wycoff Co*., 344 U.S. 237, 241 (1952) _____ 33

Rule 12(b)(1) _____ 25

Rule 12(b)(6) _____ 25

*Skaff v. Meridien North America Beverly Hills, LLC,* 506 F.3d 832, 837 (9th Cir.2007) _____ 26

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) _____ 26

Steel Co., 523 U.S. at 103–04, 118 S.Ct. 1003 _____ 35

*Texas Partners v. Conrock Co*., 685 F.2d 1116, 1119 (9th Cir.1982)_____ 26

*Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 602 (9th Cir.1976) _ 26

*United States v. Alaska S.S. Co.,* 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920) _____ 34

*United States v. Reyes,* 866 F.3d 316, 321 (5th Cir. 2017); *Smith v. Kentucky*, 520 S.W.3d 340, 354 (Ky. 2017) _____ 26

*Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987) _____ 24, 25

**Statutes**

18 U.S.C. § 2422(a) (2018) _____ 20

18 U.S.C. §§ 2421–2424 _____ 18

18 U.S.C.A. § 1591 _____ 21, 28

18 U.S.C.A. § 1591 (a) _____ 21

22 U.S.C. § 7101-7114 _____ 34

22 U.S.C. § 7101-7114 (2018)_____ 20

22 U.S.C. §§ 7101–7114 _____ 18

28 U.S.C. § 1331(2018)_____ 8

28 U.S.C. § 1343(3) (2018) _____ 8

42 U.S.C. § 1983 _____ 18

42 U.S.C. § 1983 (2018) _____ 8

42 U.S.C. §1983_____ 21

Nev. Rev. Stat. 201.354(1) _____ 18, 22, 34, 35

Nev. Rev. Stat. 244.345(8) _____ 18, 22, 34, 35

NRS 236.015 _____ 9

U.S.C. 18 § 2422(a) _____ 20

U.S.C.§ 2422(a) _____ 34

## *Other Authorities*

OVC FY 2014 Services for Victims of Human Trafficking Grant Application
  Nevada Office of the Attorney General – Program Narrative _____ 19

## *Rules*

4(a)(1)(B) _____ 8

4(a)(4) _____ 8

4(c) _____ 8

Fed. R. App. P. 4(a) _____ 8

FRCP 26(a)(1)(C) _____ 8

Rule 12(b)(6) _____ 24

Rule 8(a)(2) _____ 24, 25

## *Regulations*

C.F.R 22 § 40.24(b) (2018) _____ 20

## *Constitutional Provisions*

Thirteenth Amendment, U.S. Const. amend. XIII_____ 28, 30

## I.   JURISDICTIONAL STATEMENT

### A. Jurisdiction for the Appeal.

The United States District Court's jurisdiction over the underlying action was appropriate under 28 U.S.C. § 1331(2018) and 28 U.S.C. § 1343(3) (2018) because the controversy arose under the United States Constitution and 42 U.S.C. § 1983 (2018), 28 U.S.C. § 2201 (2018), and 28 U.S.C. § 2202 (2018). This Court has authority to award attorneys' fees under 42 U.S.C. § 1988 (2018). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201, and the United States District Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

Under 28 U.S.C. § 1291, the Court of Appeals has jurisdiction over "all final decisions of the district courts . . . except where a direct review may be had in the Supreme Court." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981).

### B. Timeliness of the Appeal.

This is an appeal from the October 30, 2019 final judgment (**ER0010**) resulting from the final Order dismissing the case dated October 29, 2019 (**ER001-ER0009**) which disposed of all parties' claims.  Under Fed. R. App. P. 4(a), "in a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the Notice of Appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from." Under FRCP 26(a)(1)(C), the last

day to file a Notice of Appeal in the underlying action was Friday, November 28, 2019 (the Friday following the fourth Thursday in November). Under NRS 236.015, "the Friday following the fourth Thursday in November (Family Day)" is a declared legal holiday for the State of Nevada and therefore the deadline to file the Notice was Monday, December 2, 2019, "the next day that was not a Saturday, Sunday, or legal holiday." Accordingly, the Notice of Appeal was timely filed on December 2, 2019 (**ER1148-ER1154**).

## II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred when it concluded Plaintiffs failed to establish standing to invoke federal jurisdiction to adjudicate their claims.

## III.    STATUES AND REGULATIONS

The relevant statutory provisions and regulations are set forth in Appellants' Addendum I.

## IV.    STATEMENT OF THE CASE

The State of Nevada has not only failed to enact, uphold, and conform to federal law with respect to prostitution and sex trafficking, but it has also allowed Nevadans and those sexually trafficked to Nevada to be exploited and to become victims to this exploitative industry, thus fostering a supply chain of organized sexual exploitation.

Consequently, thousands of women, just like the Appellants in this case, are illegally trafficked to Nevada to satisfy the demand of tens of thousands of sex buyers who come to Nevada expecting to purchase and sexually consume these women. The legal system Nevada has created is in conflict with federal laws specifically enacted to stop trafficking and prostitution nationally and internationally.

Appellants brought this action to close the legal loopholes that allow brothel owners, pimps, and traffickers to profit from Nevada's legally authorized exploitation and industrialization of women's bodies. It seeks to redress their injuries through declaratory relief, injunctive relief, and through a court-ordered fund for survivors. Appellees moved to dismiss the complaint, and the District Court granted their motions, concluding that Appellants lacked standing.

## A. Factual Background

Nevada has failed to take responsibility for the links between the legal market it has created and the illegal prostitution and sex trafficking in Nevada. Its abdication is causing profound harms to all women, like those in other countries where legal prostitution exists such as the Netherlands and Australia. (**ER0247-ER0254**).

Legalizing prostitution does not prevent the violence and rape in prostitution. It assents to it—defying the very purpose behind federal law. Wherever prostitution

10

enjoys legal protections, sex trafficking increases, causing the precise irreparable and continuing injuries that Ms. Charleston, Ms. Delgado-Williams and Ms. Albright-Byrd have suffered.

### 1. Appellants' Experience of Sex Trafficking

#### a. Rebekah Charleston

Appellant Rebekah Charleston was trafficked to Nevada and sent by her trafficker to "work" in a Nevada brothel. (**ER0029**). While in the brothel, Ms. Charleston was not permitted to turn down a sex buyer, was a victim of serial rape for profit, and suffered multiple violent rapes and assaults. *Id.* Any money not taken by the brothel owners was surrendered to her trafficker. During the ten years Ms. Charleston was sexually exploited, she was always returned to Nevada. In addition to being forced to "work" in a legal brothel, Ms. Charleston was also prostituted at multiple legal escort agencies in Las Vegas. (**ER0030**). Escort agencies in Las Vegas facilitate illegal prostitution to meet the high demand of people traveling to Nevada to purchase sex, most of whom incorrectly believe it is legal everywhere in the state. *Id.* Legal escort agencies in Las Vegas are fronts for sex trafficking rings to operate. *Id.* Plaintiff Charleston was sexually trafficked for more than ten (10) years before she finally escaped when federal authorities became involved. *Id.* As a result of the serial rape, sexual servitude, sexual and physical assault, psychological trauma and

bodily injury experienced by Ms. Charleston, Ms. Charleston still suffers from post-traumatic stress that affects her everyday life. (**ER0345**).

### b. Angela Delgado-Williams

Appellant Angela Delgado-Williams was enticed to travel across state lines from Texas to Las Vegas to be sex trafficked through a sex trafficking ring guised as a legal escort service. (**ER0035**). While a sex trafficking victim, Ms. Delgado-Williams was sent by her trafficker from Las Vegas to large cities all over the nation such as Chicago and Boston and was sold for sex. After Ms. Delgado-Williams performed sex acts for money on sex buyers in these large cities, she was trafficked back to Las Vegas (**ER0037**). In dealing with sex buyers in Las Vegas, most sex buyers incorrectly believed that prostitution was legal in Nevada, and the escort service took advantage of this misconception. (**ER0036**). Ms. Delgado-Williams most frequently interacted with sex buyers who traveled to Nevada solely to purchase women for sex; whether it was for a "newly divorced party," a "bachelor party," or a corporate CEO wishing to privately cheat on his wife, the sex buyers traveled across state lines to use sex trafficking victims (**ER0037**). Any money Ms. Delgado-Williams received from sex buyers was sent to her trafficker. (**ER0034; ER0036**). The sex trafficking ring guised as a legal escort service was successfully and strategically planted in Las Vegas, Nevada to intercept prostitution tourists planning to travel from Las Vegas, Nevada to the nearby communities of Pahrump

and Crystal, where the closest legal brothels were located. (**ER0037**). No matter where her traffickers would take her, they would always return to Nevada to sell Ms. Delgado-Williams, because Nevada is the state where there was and is the greatest demand for prostitution whether legal or illegal. Though Ms. Delgado-Williams suffers from post-traumatic stress disorder from her near-death assault when her sex trafficker attempted to kill her, she suffers more from the flashbacks of her memories of being sold and exploited by sex buyers, which interferes with her enjoyment of life. (**ER0039-ER040**).To this day, Ms. Delgado-Williams still suffers from the trauma from her sex trafficking experiences. Ms. Delgado-Williams cannot enjoy the relaxation of a normal vacation with her family because of the violence she experienced in hotels across the country, the majority of which occurred in Las Vegas, just miles from legal brothels. *Id.*

### c. Leah Albright-Byrd

Appellant Leah Albright-Byrd, who is a sex trafficking victim, was trafficked through Nevada's illegal sex trade at age 14. (**ER0040**). Ms. Albright-Byrd was exploited by her traffickers and was trafficked from the Bay Area to Reno and Las Vegas to make money off the prostitution tourism demand in Nevada. (**ER0042**). Ms. Albright-Byrd most frequently witnessed sex buyers have the misconception that prostitution was legal in Reno and Las Vegas. (**ER0043**). Notably, Ms. Albright-Byrd was deceived into believing that prostitution and sex trafficking was legal in

Nevada. (**ER0043**). Ms. Albright-Byrd's traffickers consistently returned her to Nevada to sell her and others similarly situated, because Nevada – due to legal prostitution – was the location where demand was highest. As a result of the serial rape, sexual servitude, sexual and physical assault, psychological trauma and bodily injury suffered by Leah Albright-Byrd, Ms. Albright-Byrd still suffers from post-traumatic stress that affects her everyday life. (**ER0345**).

### 2. Nevada's Laws Protecting the Sex Trade

Nevada is the only state in the Union which allows commercialized prostitution. Nevada has allowed brothel operation since the nineteenth century; however, the first officially sanctioned brothel was not in operation until 1971 when the Storey County Commission licensed the Mustang Ranch Brothel. (**ER0016**).

Thereafter, the Nevada Legislature passed Assembly Bill 550, (Nev. Rev. Stat. 201.354(1)), authorizing prostitution or solicitation for prostitution in Nevada in designated brothels licensed by a county. State law presently allows counties of less than seven hundred thousand (700,000) residents to issue the licenses. Nev. Rev. Stat. 244.345(8). In counties with populations of less than 700,000, Nevada's legal brothels are estimated to generate more than seventy-five million dollars ($75,000,000) per year, while at the same time fueling Nevada's illegal prostitution market, which in Las Vegas is estimated to gross over five billion dollars ($5,000,000,000) per year. (**ER0025**). Nevada's illegal sex trade is estimated to be

twice as large as other states. (**ER0021**). At least five thousand sixteen (5,016) individuals are sold for sex in an average month in Nevada. *Id.*

Nevada local governments with populations of less than 700,000, which are political subdivisions of the State and who can only exercise specific enumerated powers expressly granted by the State, receive hundreds of thousands of dollars in brothel taxes and fees. (**ER0346**). Local governments are only authorized to enact, promulgate and enforce ordinances within the authority granted to them by the State. *See City of Reno v. Reno Police Protective Ass'n*, 98 Nev. 472, 475, 653 P.2d 156, 158 (1982) (allowances provided by the general laws of the state may not, absent a special legislative dispensation, be prohibited by local ordinances). These local governments under the color of state law are permitted to act as de facto pimps who get their cut of what prostituted women charge interstate and foreign travelers who come to Nevada brothels to engage in prostitution. Meanwhile, local governments with populations of more than 700,000 who are prohibited from legalizing prostitution in licensed brothels, like Las Vegas, aggressively promote prostitution as a means to encourage tourism to Nevada. (**ER0357**).

Most men who buy women for sex come from out-of-state. (**ER0347**). Likewise, the women bought, sold, and trafficked to Nevada come from other states and countries outside the State. *Id.* Under the cover of Nevada law legalizing prostitution, brothels, brothel owners and operators, and the women bought and sold

in brothels for sex, actively and intentionally persuade, induce, entice, and coerce men and women to travel in interstate commerce to engage in prostitution by advertising and marketing brothels and the sale of people for sex to individuals outside Nevada through hundreds of websites, social media accounts, and other mass media. (**ER0059-ER0161)**; (**ER0161-ER0164**). It is unlikely that Nevada brothels would be financially viable without the revenue generated by these interstate efforts. (**ER00347**).

Examples of these interstate efforts abound. For instance, one former brothel owner explained to the "Business Insider" in detail how he promoted his brothel business nationally and internationally, admitting that he is encouraging or persuading people to travel in interstate or foreign commerce to engage in prostitution, in violation of the Mann Act (**ER0169-ER0172**).

Many women prostituted in Nevada brothels are controlled by outside pimps: "Despite the fiction that they are 'independent contractors,' most so-called legal prostitutes have pimps — the state-sanctioned pimps who run the brothels and, in many cases, a second pimp who controls all other aspects of their lives (and takes the bulk of their legal earnings)." (**ER0357**).  One federal court acknowledged this problem recently citing a study that found that pimps remained common and some assaults against prostituted women occurred within Nevada's legal brothels. *Coyote Publishing, Inc. v. Miller*, 598 F. 3d 592, 596 fn2 (2010).

16

And in 2018, the Lyon County Sheriff's Office conducted multiple brothel work card compliance checks, assisted by U.S. Immigration and Customs Enforcement officers, and found numerous illegal practices, including immigration law violations, fraudulent statements, and indicators of sex trafficking from a foreign country. (**ER0288-ER0296**). Sheriff Al McNeil noted that "the discovery of U.S. immigration law violations in our legal brothel system is extremely alarming. The ability to coerce, exploit, and traffic non-U.S. citizens into Lyon County by foreign criminal enterprises is going to be difficult to detect and deter by our limited capabilities and resources of foreign-born applicants." (**ER0028**).

Further, a Lyon County audit of the Applications for Brothel Work Permits discovered that one hundred sixty-eight (168) out of two hundred forty-one (241) applicants for prostitute work cards reside in a state other than Nevada and must travel in interstate commerce, from their state of residence to Nevada, to engage in prostitution at the brothels. *Id.* Thirty-seven (37) of the women registered for prostitute work cards from Lyon County in 2017-2018 alone have traveled in foreign commerce, from their international permanent residence to Nevada, to engage in prostitution at the brothels. *Id.*

The State's creation of an intrastate commercialized prostitution market exerts a substantial economic effect; therefore, Nevada's legal brothels, operating pursuant to Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8), violate and directly

conflict with 42 U.S.C. § 1983; the federal Mann Act, codified at 18 U.S.C. §§ 2424 (Mann Act); and the Victims of Trafficking and Violence Protection Act of 2000, codified at 22 U.S.C. §§ 7101–7114 (TVPA).

Numerous studies have shown prostitution and sex trafficking are inextricably linked and wherever legal prostitution exists, sex trafficking increases. (**ER0019**). The federal government acknowledges the link between prostitution and trafficking in women and children, as a form of modern-day slavery. (**ER0300-ER0301**). In 2002, the President of the United States issued a National Security Directive declaring, "The United States Government opposes prostitution and any related activities, including pimping, pandering, or maintaining brothels," because these activities contribute to human trafficking. (**ER0020**).

And, incidentally, so does the State of Nevada. In 2014, the Attorney General's office submitted a grant application in connection with statewide initiatives to combat human trafficking, particularly minor sex trafficking stated:

> …Nevada is a major national and even global destination, because Nevada is also synonymous with legalized gambling, legalized prostitution, clubbing, partying, bars, strip clubs, celebrities, glamour and gaudy excess – a grand spectacle of legitimized sin 24/7, 365 days per year! Nevada epitomizes the concept of an adult entertainment Mecca and averages over 50 million out-of-state visitors per year.
>
> . . .
>
> A very little known fact – completely unknown to most

visitors – is that prostitution is not universally legal in Nevada.

. . .

The brothel business operates on the premise, widely accepted in Nevada, that brothel prostitutes are all adults truly exercising their voluntary, free and informed choice of profession. While the premise is arguable on at least two counts, most prostitutes 'enter' the business in their early to mid-teens and there are rural brothels specializing solely in young Asian women that speak no English. Brothel workers are not employees, but are contracted workers who frequently have an outside 'manager.'

. . .

Meanwhile, those purveying cheaper illegal prostitution, must increase their work force numbers and productivity in order to maintain their profit margins. Nevada's dilemma when dealing with possible trafficking victims in rural brothels is classifying them for purposes such as this grant. . . . Nevada's legal brothels complicate development of a consistent statewide response to sex trafficking.

. . .

Nevada's recognition as one of the top trafficking destinations by multiple government and non-profit advocacy agencies is earned by effectively marketing the state's entertainment and fantasy fulfillment possibilities.

*See* OVC FY 2014 Services for Victims of Human Trafficking Grant Application Nevada Office of the Attorney General – Program Narrative.

### 3. Federal Law on the Sex Trade and Sex Trafficking

On June 25, 1910, Congress passed the Mann Act (codified as 18 U.S.C. § 2422(a) (2018)), which criminalized the interstate or foreign commerce transport "of

any woman or girl for prostitution, debauchery, or for any other immoral purpose."

The primary intent was to combat prostitution, immorality, and human trafficking

for the purposes of prostitution in the United States. C.F.R 22 § 40.24(b) (2018)

defines prostitution as "engaging in promiscuous sexual intercourse for hire." The

Mann Act has since been amended to cover any person, and ban transport for

prostitution or other sexual offenses:

> Whoever knowingly persuades, induces, entices, or coerces
> any individual to travel in interstate or foreign commerce, or
> in any Territory or Possession of the United States, to engage
> in prostitution, or in any sexual activity for which any person
> can be charged with a criminal offense, or attempts to do so,
> shall be fined under this title or imprisoned not more than 20
> years, or both.

U.S.C. 18 § 2422(a).

On October 28, 2000, Congress passed the TVPA (codified as 22 U.S.C. §

7101-7114 (2018)), which criminalized human trafficking, including sex trafficking,

and related offenses as federal crimes with severe penalties attached and established

several methods to prosecute traffickers.

The law specifically applies to anyone who "recruits, entices, harbors,

transports, provides, obtains, advertises, maintains, patronizes, or solicits," a person

for purposes of, or benefits (financially or otherwise) from, participating in sex

trafficking. 18 U.S.C.A. § 1591 (a). Sex trafficking is defined as making a person

under the age of 18 engage in a commercial sex act, or using force, fraud, or coercion

to do the same thing to someone over 18. 18 U.S.C.A. § 1591. U.S.C. 22 § 7102(4) defines "commercial sex act" as "any sex act on account of which anything of value is given to or received by any person."

Both statutes evince Congress's intent to prevent persons from persuading, inducing, enticing, and/or coercing any person to travel across state lines to engage in prostitution, and ensure just and effective punishment of traffickers and anyone enabling traffickers, and to protect victims.

### B. Procedural History

This is an appeal from Orders (**ER001-ER0009; ER0010**) of the United States District Court of Nevada granting Motions to Dismiss First Amended Complaint (**ER0302-ER0317, ER0318-ER0342**) in favor of Defendants/Respondents State of Nevada, Governor Steve Sisolak, and Legislature of the State of Nevada in a civil rights action brought under 42 U.S.C. §1983. This action was filed by the Appellants/Plaintiffs Rebekah Charleston, Angela Delgado-Williams, and Leah Albright-Byrd. (**ER0011-ER0055**). All Appellants are women who have been profoundly harmed by sexual violence as victims of sex trafficking primarily in Nevada. (**ER0001-ER0009**). Their complaint argued that by disregarding federal law, Defendants' acts, including, but not limited to, authorizing a legalized commercial prostitution market to operate in the State of Nevada, have created the danger that has resulted in irreparable injuries to the Appellants by

exposing them to sex trafficking and prostitution in violation of their federally protected rights. (**ER0011-ER0055**).

Appellants contend that with the cover of Nevada's validation and legalization of prostitution, brothels, brothel owners and operators, and the women bought and sold in brothels for sex, actively and intentionally persuade, induce, entice, and coerce men and women to travel in interstate commerce to engage in prostitution by advertising and marketing brothels and the sale of people for sex to individuals outside the State of Nevada through hundreds of websites, social media accounts, and other mass media. (**ER0011-ER0055**).

Appellants sought an order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, licensing brothels unconstitutional, null, and void as preempted by federal law; and, further requested that a preliminary and permanent injunction be issued prohibiting the State of Nevada and its political subdivisions from continuing to implement, enforce, or put into force and effect Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8). Plaintiffs/Appellants also requested an order for the State of Nevada to create and fund a "Nevada Sex Trade Exit Fund" to provide mental health services, rent assistance, job training, scholarships, and funding for medical treatments for women prostituted through Nevada's legal brothels. (**ER0011-ER0055**).

On April 3, 2019, Defendants State of Nevada and Governor Steve Sisolak moved to dismiss the complaint (**ER0301a-ER0317**), and as did Defendant Legislature of the State of Nevada on April 30, 2019 (**ER0318-ER0342**), arguing, among other things, that Appellants lack standing to bring the action. (**ER0301a-ER0317; ER0318-ER0342**). The District Court dismissed the case and granted the motions on October 29, 2019, concluding that Appellants failed to demonstrate standing (**ER0001-ER0009**).

## V.   SUMMARY OF ARGUMENT

The District Court erred by essentially treating Defendants' motions to dismiss as motions for summary judgment. Appellants need not prove each element of their claims at the pleadings stage. Rather, Appellants were only required to plead sufficient facts and related claims for relief to invoke the jurisdiction of the Federal Court. In this regard, Appellants have alleged enough to show that they have suffered injuries that are both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical," that  there was a causal link between the injury and the Defendants' conduct, and that their injuries can be redressed by Appellants' requested relief. *See* (**ER0301a-ER0317;ER0878-ER0903**).

The Plaintiffs' claims must be accepted as true and given favorable inference at the motion to dismiss stage. *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987). The Plaintiffs have alleged facts showing the injury to themselves – namely,

the consequences of serial rape, sexual servitude, sexual and physical assault, repeated revictimization, psychological trauma, bodily injury, and risk of sexually transmitted diseases. The Plaintiffs have also shown the nexus to the Defendants' legalized prostitution scheme, and have requested relief – specifically declaratory and injunctive relief eliminating Nevada's legalized prostitution scheme and funding to assist with navigating the ongoing effects of years-long trauma, which would redress their injuries. (**ER0345**). The Plaintiffs have thus alleged facts sufficient to show Article III standing and ask that this Court reverse the District Court's decision.

## VI.    ARGUMENT

Appellants' argument will proceed by describing the standard of review, and arguing that Appellants have alleged sufficient facts to demonstrate Article III standing by showing that they suffered past and ongoing injuries from being sex trafficked, that their injuries can be traced to Nevada's protection of the sex trade, and that their injuries can be redressed through a declaratory judgment, injunctive relief, and the creation of a survivors' fund.

### A. Standard of Review

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only Rule 8(a)(2)'s minimal notice pleading requirements. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) requires only that the complaint include "a short and plain statement of the claim

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court must presume all factual allegations of complaint to be true and draw all reasonable inferences in favor of nonmoving party. *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987).

Where, as here, a defendant moves to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction on its face, the "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)(internal citations omitted). Here, the Federal District Court erred when dismissing Appellants' Complaint by failing to presume all the Complaint's factual allegations are true and by failing to draw all reasonable inferences in Appellants' favor. Evaluation of a Rule 12(b)(6) motion (unlike a Rule 56 motion) includes leave to amend the complaint where appropriate, a point on which the District Court was silent. (**ER0009**).

The underlying Court has inappropriately granted what amounts to summary judgment to Defendants and prematurely cut off Appellants' opportunity to engage in discovery and prove up their allegations regarding each and every element of their claim, including the harms they claimed and the redressability of their injuries. A

court should not convert a motion to dismiss into a summary judgment motion where no discovery has taken place. *Texas Partners v. Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir.1982) (citing *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 602 (9th Cir.1976) ("Putting plaintiffs to the test without ample opportunity for discovery is particularly disfavored.").

To establish Article III standing, plaintiffs must demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (cleaned up)[1]; *see also Skaff v. Meridien North America Beverly Hills, LLC,* 506 F.3d 832, 837 (9th Cir.2007); *Moeller v. Taco Bell Corp.*, 816 F.Supp.2d 831, 849 (N.D.Cal. 2011). The Plaintiffs, "as the part[ies] invoking federal jurisdiction, bear[] the burden of establishing these elements," however, when "a case is at the pleading stage, the plaintiff[s] must 'clearly allege facts demonstrating each element.'" *Spokeo,* 136 S. Ct. at 1547 (cleaned up).

### B. Appellants Have Pled Sufficient Facts to Show They Were Injured by Being Trafficked for Sex.

---

[1] This brief uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., United States v. Reyes,* 866 F.3d 316, 321 (5th Cir. 2017); *Smith v. Kentucky*, 520 S.W.3d 340, 354 (Ky. 2017); *I.L. v. Knox County Board Of Education*, No. 3:15-CV-558, 2017 U.S. Dist. LEXIS 92257, at *24 & n.4 (E.D. Tenn. June 15, 2017).

For standing purposes, an "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560(1992) (cleaned up).

The District Court refused to consider Appellants' subjection to sex trafficking in its injury-in-fact analysis, looking only at whether Appellants had alleged enough risk that they could be sex trafficked again in the future. (**ER0005-ER0007**). However, each Plaintiff alleged being brought to the State of Nevada for the sole purpose of being sex trafficked over and over again. Residing outside Nevada was no protection from being trafficked to Nevada. Indeed, for these Plaintiffs all sex trafficking roads lead back to the State of Nevada. (**ER0030; ER0040; ER0044**). The Court also seemed skeptical that current suffering from post-traumatic stress disorder was an injury-in-fact.[2] (**ER0006**). Yet the physical and psychological effects of sex trafficking and prostitution endure long after victims escape from their context of sexual exploitation. (**ER0044; ER0355; ER0901**). Sexual violations are inflicted in and on the body, the place where one's

---

[2] It is difficult, if not impossible, for victims of sex trafficking to avail themselves of the protections of federal law, the Constitution, and the federal court while they are being trafficked because victims of sex trafficking, involuntary sexual servitude, and trafficking in persons are inherently prevented from access to the legal and civil remedies during their period of victimization. (**ER0355; ER0900**).

consciousness resides. Thus, a survivor can never entirely escape or be free from the setting where the violations took place.

Not even considering the whole of Appellants' allegations of injury in the injury analysis is exactly the opposite of accepting the Appellants' facts as true and drawing reasonable inferences in their favor. Taking Appellants' claims of being sex trafficked as true, it is reasonable to infer that they were injured, and continue to suffer those injuries' effects, and suffer exponentially higher risk of re-victimization.[3]

It is axiomatic that Appellants have a legally protected interest in not being subjected to sex trafficking, not least because both the Thirteenth Amendment, U.S. Const. amend. XIII, and the TVPA, 18 U.S.C.A. § 1591, establish such a right. By alleging that they were repeatedly trafficked for sex, and are at a higher risk of re-victimization, Appellants have alleged a concrete, particularized injury – namely,

---

[3] It is widely understood by clinicians that people typically re-enter commercial sexual exploitation multiple times before permanently leaving. *See* Hammond, G. C., & McGlone, M. (2014). Entry, progression, exit, and service provision for survivors of sex trafficking: Implications for effective interventions. *Global Social Welfare*, *1*(4), 157-168; Baker, L. M., Dalla, R. L., & Williamson, C. (2010). Exiting prostitution: An integrated model. Violence Against Women, 16(5), 579-600; Wilson, B., & Butler, L. D. (2014). Running a gauntlet: A review of victimization and violence in the pre-entry, post-entry, and peri-/post-exit periods of commercial sexual exploitation. *Psychological Trauma: Theory, Research, Practice, and Policy, 6*(5), 494–504.

the physical and psychological consequences of being subjected to serial rape for someone else's profit. (**ER0029; ER0345; ER0881**) Plaintiffs of course allege that these human rights abuses actually happened to them, not that they hypothetically could happen to them. (**ER0344; ER0349**).

Accordingly, Appellants have sufficiently pled facts showing that they suffered an injury for Article III standing purposes.

### C. Appellants Have Pled Sufficient Facts to Show Their Sex Trafficking is Traceable to Nevada's Protection of the Sex Trade.

The District Court concluded that the Appellants could not show that their injuries were "fairly traceable" to the State's conduct, reasoning that Appellants were trafficked due to the intervening actions of third parties (Plaintiffs' traffickers), not Nevada's conduct. (**ER0005**).

But state action, including by enacting and enforcing statutes, that effectively creates situations of involuntary servitude or slavery has been found to violate the Thirteenth Amendment, even where third-party actions were necessary for the statutes to have any effect. *Bailey v. State of Alabama*, 219 U.S. 219, 227 (1911). *See also Taylor v. State of Ga.*, 315 U.S. 25 (1942) (holding that Georgia statute making it illegal to obtain anything of value on a contract for services without completing the contract violated Thirteenth Amendment ban on involuntary servitude).

29

In *Bailey*, Alabama had a statute that made it a crime for anyone "with intent to injure or defraud his employer" to enter into a written contract for services, receive payment, and breach the contract by not performing or returning the money. *Bailey v. State of Alabama*, 219 U.S. 219, 227-28 (1911) (cleaned up). Alabama also had an evidentiary rule that banned a person accused under the statute from testifying about any "uncommunicated motives, purpose, or intention." 219 U.S. at 227-28 (cleaned up). The Supreme Court found that statute's effect was not just to prevent fraud:

> We cannot escape the conclusion that, although [sic] the statute in terms is to punish fraud, still its natural and inevitable effect is to expose to conviction for crime those who simply fail or refuse to perform contracts for personal service in liquidation of a debt; and judging its purpose by its effect, that it seeks in this way to provide the means of compulsion through which performance of such service may be secured. The question is whether such a statute is constitutional.

*Id.* at 238.

Congress had already banned debt bondage as a Thirteenth Amendment violation, 219 U.S. at 240, which the Court defined as "compulsory service in payment of a debt. A peon is one who is compelled to work for his creditor until his debt is paid," *Id.* at 242. In finding that the statute was unconstitutional, the Court explained that:

> [T]he state could not avail itself of the sanction of the criminal law to supply the compulsion any more than it

30

> could use or authorize the use of physical force. . . .What the state may not do directly it may not do indirectly. . . Without imputing any actual motive to oppress, we must consider the natural operation of the statute here in question and it is apparent that it furnishes a convenient instrument for the coercion which the Constitution and the act of Congress forbid; an instrument of compulsion peculiarly effective as against the poor and the ignorant, its most likely victims.

*Id.* at 244–45(cleaned up).

No one could be subjected to peonage without a third party's actions (someone creating the contract at issue, and then someone else breaking it), yet the Supreme Court still held that because the law criminalized refusing to complete a contract for services, it effectively sanctioned debt bondage just by being enacted.

In other words, the Supreme Court held that unconstitutional conditions of involuntary servitude in Alabama were causally connected to Alabama state law on breach of contract and fraud. Importantly, the Court found that the state was violating the constitution in *Bailey* in evaluating the case's merits, where the standard of proof was much higher than it is here, in a standing inquiry. The Appellants in this case need only allege facts, which if true, show that Nevada's legal regime effectively sanctions their own involuntary servitude.

Nevada has also created a legal regime which protects a form of slavery, even if the law's stated purpose is only to legalize prostitution. As in *Bailey*, Congress has enacted statutes banning the form of slavery that the state statutes enable. The

practical effect of Nevada's laws is involuntary sexual servitude, where instead of ordinary labor until a debt is paid, people are subjected to rape and other forms of violence repeatedly and indefinitely.

As described above and alleged in the complaint, this occurs in at least two ways. First, legalizing prostitution in some counties makes Nevada a destination for the sex trade. The demand for legalized prostitution always exceeds the consenting supply, which means people will be sex trafficked to make up the difference.[4] If Nevada did not permit legal prostitution, Appellants would not have been trafficked to Nevada. On average, jurisdictions with legal prostitution have statistically significantly larger reported incidences of illegal sex trafficking. As one expert put it, "wherever prostitution is legalized, trafficking to sex industry marketplaces in that region increases." (**ER0020;ER0356**). Second, the legal protections for prostitution create a pretext for illegal operators to traffic people, mislead buyers about the legality of their actions, and hide victims in plain sight.

In other words, the Appellants have alleged sufficient facts to show that their subjection to sexual slavery is "fairly traceable" to the Defendants' legal protection for the sex trade.

### D. Appellants Have Pled Sufficient Facts to Show Their Sex Trafficking

---

[4] This phenomenon is widespread: a 2012 study of 150 countries concluded that legal prostitution increases sex trafficking, due to the expanded market for commercial sex. (**ER0176-ER0223**).

**Injuries Can Be Redressed by Declaratory and Injunctive Relief, and Survivor-Focused Resources.**

Declaratory relief may be sought as a means to challenge the constitutionality of a federal law or state statute or local ordinance and is within the sound discretion of the Court. *See Doe v. Gallinot* (9th Cir. 1981) 657 F2d 1017; *see also*, *Mechling Barge Lines v. United States*, 368 U.S. 324, 331 (1961); *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 241 (1952). The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (U.S. 2007).

A particular declaratory-judgment action satisfies the case-or-controversy requirement when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127-28 (U.S. 2007) (*quoting*, *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273).

A controversy must be "definite and concrete," 300 U.S. at 240–241, and is "distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot," 300 U.S. at 240 (*citing United States v. Alaska S.S. Co.,* 253 U.S. 113, 116 (1920)).

In this case, Appellants pleaded facts, that are not hypothetical, sufficiently to establish that an actual controversy exists. Specifically, the Appellants have alleged Nevada's actions, including, but not limited to, authorizing a legalized commercial sex trafficking and prostitution market to operate in Nevada, has created a legal industry that has exposed Appellants and other similarly situated to Appellants to the dangers and resulting injuries of sex trafficking, an exponentially higher risk of re-victimization and prostitution (i.e., serial rape, sexual servitude, sexual and physical assault, psychological trauma, bodily injury, and risk of sexually transmitted diseases), disregarding the protections that the federal law was enacted to provide.

Further, Appellants submit that, because the brothel industry causes individuals to travel in interstate and foreign commerce to buy people for prostitution, Nev. Rev. Stat. 201.354(1) and Nev. Rev. Stat. 244.345(8) cannot exist simultaneously with 18 U.S.C.§ 2422(a) and 22 U.S.C. § 7101-7114, and thereby is preempted and in violation of the Supremacy Clause of the U.S. Constitution. The Mann Act applies each and every time a person enters into Nevada to engage in prostitution and/or is induced, persuaded, …. to enter Nevada to engage in prostitution. Therefore, Appellants asked the underlying Court for an order declaring Nev. Rev. Stat. 201.354(1), Nev. Rev. Stat. 244.345(8), and the ordinances of Elko, Lander, Lyon, Mineral, Nye, Storey, and White Pine Counties, licensing brothels unconstitutional, null, and void as preempted by federal law. Plaintiffs have thus

alleged facts showing a case or controversy required for declaratory judgment relief.

Additionally, Plaintiffs have alleged facts showing that their injuries could be redressed by the "Nevada Sex Trade Exit Fund," which they also request as a form of relief. Taking their sex trafficking allegations as true and drawing reasonable inferences in their favor, Appellants' injuries could be redressed by funds assisting them with mental health services, rent assistance, job training, scholarships, and funding for medical treatments. (**ER0345**;**ER0880**).

Notably, the District Court did not provide any analysis in ruling that Appellants had failed the redressability prong of standing, but only its conclusions:

> The Court's conclusion regarding causation also leads the Court to conclude that Plaintiffs fail to show redressability. That is, the facts Plaintiffs allege do not demonstrate a likelihood that the primary relief Plaintiffs request—declaratory relief and injunction concerning legal prostitution in Nevada—will redress their alleged injuries as a result of being illegally forced into prostitution and being sex trafficked. *Steel Co.*, 523 U.S. at 103–04, 118 S.Ct. 1003 (defining redressability).

(**ER0008**).

Plaintiffs allege they were repeatedly brought back to Nevada to be sex trafficked and that their risk for re-victimization is exponentially higher. (**ER0029; ER0345; ER0881**).[5] Eliminating Nevada's legalized prostitution market through Plaintiffs' requested declaratory and injunctive relief will redress these injuries. The

---

[5] *See Footnote 3.*

District Court did not even acknowledge Appellants' requested Exit Fund relief, referring only to the declaratory and injunctive relief. Thus, the District Court erred by concluding that Appellants' allegations did not show that their requested relief could redress their injuries without even considering all the Appellants' requested relief.

As Plaintiffs have alleged facts showing a substantial, non-academic legal controversy in connection with their request for declaratory judgment, and have requested relief in the form of a fund which would provide redress for the ongoing injuries due to their trauma and risk for re-victimization, they have satisfied the redressability requirement of Article III standing at the motion to dismiss stage.

## VII. CONCLUSION

For the reasons described above, the Appellants have pled sufficient facts showing that they meet the injury, traceability, and redressability requirements for Article III standing. In accordance with the foregoing, Appellants respectfully request that this Court reverse the District Court's Order dismissing their Complaint and give them an opportunity to engage in discovery and prove up their claims for relief.

## CERTIFICATE OF COMPLIANCE

**Certificate of Compliance Pursuant to
Fed. R. App. P. 32(a)(7)(c) and Circuit Rule 32-1
for Case Number 19-17423**

I certify pursuant to Fed. R. App. P. 32(a)(7)(c) and Ninth Circuit Rule 32-1,

that the attached opening brief is proportionately spaced, has a typeface of 14 points,

and contains 7, 302 words.

Dated: March 4, 2020.

HUTCHISON & STEFFEN, PLLC

/s/ Jason D. Guinasso

_____
Jason D. Guinasso (Bar No.8478)
HUTCHISON & STEFFEN, LLC
500 Damonte Ranch Parkway, Suite 980
Reno, NV 89521
Phone: 775.853.8746
Fax: 775.201.9611
jguinasso@hutchlegal.com

## CERTIFICATE OF RELATED CASES

**Certificate of Related Cases**
**Ninth Circuit Rule 28-2.6**
**for Case Number 19-17423**

Pursuant to Ninth Circuit 28-2.6, appellants state that they are not aware of any related cases pending in this Court.

**ADDENDUM**

Statutory Addendum

18 U.S.C. § 2422(a) (2018)……………………………………………….AD-4

18 U.S.C.A. § 2421…………………………………………………….AD-4

18 U.S.C.A. § 2423 …………………………………………………….AD-5

18 U.S.C.A. § 2424…………………………………………………...AD-7

18 U.S.C.A. § 1591…………………………………………………...AD-8

22 U.S.C.A. § 7101……………………………………………………AD-11

22 U.S.C.A. § 7102……………………………………………………AD-19

22 U.S.C.A. § 7103……………………………………………………AD-26

22 U.S.C.A. § 7103a…………………………………………………...AD-38

22 U.S.C.A. § 7104……………………………………………………AD-44

22 U.S.C.A. § 7104a…………………………………………………...AD-58

22 U.S.C.A. § 7104b…………………………………………………...AD-60

22 U.S.C.A. § 7104c…………………………………………………...AD-65

22 U.S.C.A. § 7104d…………………………………………………...AD-65

22 U.S.C.A. § 7104e…………………………………………………...AD-66

22 U.S.C.A. § 7105……………………………………………………AD-68

22 U.S.C.A. § 7105a…………………………………………………...AD-89

22 U.S.C.A. § 7105b…………………………………………………...AD-93

22 U.S.C.A. § 7106……………………………………………………AD-93

22 U.S.C.A. § 7107……………………………………………………AD-99

22 U.S.C.A. § 7108……………………………………………..AD-116

22 U.S.C.A. § 7109……………………………………………..AD-119

22 U.S.C.A. § 7109a……………………………………………AD-121

22 U.S.C.A. § 7109b……………………………………………AD-125

22 U.S.C.A. § 7110……………………………………………..AD-126

22 U.S.C.A. § 7111……………………………………………..AD-131

22 U.S.C.A. § 7112……………………………………………..AD-132

22 U.S.C.A. § 7113……………………………………………..AD-134

22 U.S.C.A. § 7114……………………………………………..AD-140

28 U.S.C.A. § 1331……………………………………………..AD-146

28 U.S.C.A. § 1343 (Excerpt)………………………………..AD-146

42 U.S.C.A. § 1983……………………………………………..AD-146

N.R.S. 201.3544…………………………………………………...AD-147

N.R.S. 244.345…………………………………………………AD-152

N.R.S. 236.015 (Excerpt)……………………………………….AD-156

22 C.F.R. § 40.24……………………………………………..AD-
156

I.  **18 U.S.C. § 2422(a) (2018) (Excerpt)**

(a) Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

II.  **18 U.S.C.A. § 2421**

**(a) In general.**--Whoever knowingly transports any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

**(b) Requests to prosecute violations by State attorneys general.**--

> **(1) In general.**--The Attorney General shall grant a request by a State attorney general that a State or local attorney be cross designated to prosecute a violation of this section unless the Attorney General determines that granting the request would undermine the administration of justice.

> **(2) Reason for denial.**--If the Attorney General denies a request under paragraph (1), the Attorney General shall submit to the State attorney general

a detailed reason for the denial not later than 60 days after the date on which a request is received.

## III.    18 U.S.C.A. § 2423

(a) Transportation with intent to engage in criminal sexual activity.--A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

(b) Travel with intent to engage in illicit sexual conduct.--A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, with a motivating purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

(c) Engaging in illicit sexual conduct in foreign places.--Any United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

(d) **Ancillary offenses.**--Whoever, for the purpose of commercial advantage or private financial gain, arranges, induces, procures, or facilitates the travel of a person knowing that such a person is traveling in interstate commerce or foreign commerce with a motivating purpose of engaging in illicit sexual conduct shall be fined under this title, imprisoned not more than 30 years, or both.

(e) **Attempt and conspiracy.**--Whoever attempts or conspires to violate subsection (a), (b), (c), or (d) shall be punishable in the same manner as a completed violation of that subsection.

(f) **Definition.**--As used in this section, the term "illicit sexual conduct" means--

(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States;

(2) any commercial sex act (as defined in section 1591) with a person under 18 years of age; or

(3) production of child pornography (as defined in section 2256(8)).

(g) **Defense.**--In a prosecution under this section based on illicit sexual conduct as defined in subsection (f)(2), it is a defense, which the defendant must establish by clear and convincing evidence, that the defendant reasonably believed

that the person with whom the defendant engaged in the commercial sex act had attained the age of 18 years.

## IV.    18 U.S.C.A. § 2424

**(a)** Whoever keeps, maintains, controls, supports, or harbors in any house or place for the purpose of prostitution, or for any other immoral purpose, any individual, knowing or in reckless disregard of the fact that the individual is an alien, shall file with the Commissioner of Immigration and Naturalization a statement in writing setting forth the name of such individual, the place at which that individual is kept, and all facts as to the date of that individual's entry into the United States, the port through which that individual entered, that individual's age, nationality, and parentage, and concerning that individual's procuration to come to this country within the knowledge of such person; and

Whoever fails within five business days after commencing to keep, maintain, control, support, or harbor in any house or place for the purpose of prostitution, or for any other immoral purpose, any alien individual to file such statement concerning such alien individual with the Commissioner of Immigration and Naturalization; or Whoever knowingly and willfully states falsely or fails to disclose in such statement any fact within that person's knowledge or belief with reference to the age,

nationality, or parentage of any such alien individual, or concerning that individual's procuration to come to this country--

Shall be fined under this title or imprisoned not more than 10 years, or both.

**(b)** In any prosecution brought under this section, if it appears that any such statement required is not on file in the office of the Commissioner of Immigration and Naturalization, the person whose duty it is to file such statement shall be presumed to have failed to file said statement, unless such person or persons shall prove otherwise. No person shall be excused from furnishing the statement, as required by this section, on the ground or for the reason that the statement so required by that person, or the information therein contained, might tend to criminate that person or subject that person to a penalty or forfeiture, but no information contained in the statement or any evidence which is directly or indirectly derived from such information may be used against any person making such statement in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with this section.

**V.    18 U.S.C.A. § 1591**

**(a)** Whoever knowingly--

**(1)** in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices,

harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

**(2)** benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

**(b)** The punishment for an offense under subsection (a) is--

**(1)** if the offense was effected by means of force, threats of force, fraud, or coercion described in subsection (e)(2), or by any combination of such means, or if the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited had not attained the age of 14 years at the time of such offense, by a fine under this title and imprisonment for any term of years not less than 15 or for life; or

**(2)** if the offense was not so effected, and the person recruited, enticed, harbored, transported, provided, obtained, advertised, patronized, or solicited

had attained the age of 14 years but had not attained the age of 18 years at the time of such offense, by a fine under this title and imprisonment for not less than 10 years or for life.

**(c)** In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.

**(d)** Whoever obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be fined under this title, imprisoned for a term not to exceed 25 years, or both.

**(e)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "coercion" means--

    **(A)** threats of serious harm to or physical restraint against any person;

**(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

**(C)** the abuse or threatened abuse of law or the legal process.

**(3)** The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

**(4)** The term "participation in a venture" means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1).

**(5)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

**(6)** The term "venture" means any group of two or more individuals associated in fact, whether or not a legal entity.

**VI.    22 U.S.C.A. § 7101**

**(a) Purposes**

The purposes of this chapter are to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and

children, to ensure just and effective punishment of traffickers, and to protect their victims.

**(b) Findings**

Congress finds that:

**(1)** As the 21st century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today. At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year.

**(2)** Many of these persons are trafficked into the international sex trade, often by force, fraud, or coercion. The sex industry has rapidly expanded over the past several decades. It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services. The low status of women in many parts of the world has contributed to a burgeoning of the trafficking industry.

**(3)** Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide.

**(4)** Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin. Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models. Traffickers also buy children from poor families and sell them into prostitution or into various types of forced or bonded labor.

**(5)** Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable.

**(6)** Victims are often forced through physical violence to engage in sex acts or perform slavery-like labor. Such force includes rape and other forms of sexual abuse, torture, starvation, imprisonment, threats, psychological abuse, and coercion.

**(7)** Traffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape. Such representations can have the same coercive effects on victims as direct threats to inflict such harm.

**(8)** Trafficking in persons is increasingly perpetrated by organized, sophisticated criminal enterprises. Such trafficking is the fastest growing source of profits for organized criminal enterprises worldwide. Profits from the trafficking industry contribute to the expansion of organized crime in the United States and worldwide. Trafficking in persons is often aided by official corruption in countries of origin, transit, and destination, thereby threatening the rule of law.

**(9)** Trafficking includes all the elements of the crime of forcible rape when it involves the involuntary participation of another person in sex acts by means of fraud, force, or coercion.

**(10)** Trafficking also involves violations of other laws, including labor and immigration codes and laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion.

**(11)** Trafficking exposes victims to serious health risks. Women and children trafficked in the sex industry are exposed to deadly diseases, including HIV and AIDS. Trafficking victims are sometimes worked or physically brutalized to death.

**(12)** Trafficking in persons substantially affects interstate and foreign commerce. Trafficking for such purposes as involuntary servitude, peonage, and other forms of forced labor has an impact on the nationwide employment

network and labor market. Within the context of slavery, servitude, and labor or services which are obtained or maintained through coercive conduct that amounts to a condition of servitude, victims are subjected to a range of violations.

**(13)** Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In United States v. Kozminski, 487 U.S. 931 (1988), the Supreme Court found that section 1584 of Title 18, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to criminalize only servitude that is brought about through use or threatened use of physical or legal coercion, and to exclude other conduct that can have the same purpose and effect.

**(14)** Existing legislation and law enforcement in the United States and other countries are inadequate to deter trafficking and bring traffickers to justice, failing to reflect the gravity of the offenses involved. No comprehensive law exists in the United States that penalizes the range of offenses involved in the trafficking scheme. Instead, even the most brutal instances of trafficking in the sex industry are often punished under laws that also apply to lesser offenses, so that traffickers typically escape deserved punishment.

**(15)** In the United States, the seriousness of this crime and its components is not reflected in current sentencing guidelines, resulting in weak penalties for convicted traffickers.

**(16)** In some countries, enforcement against traffickers is also hindered by official indifference, by corruption, and sometimes even by official participation in trafficking.

**(17)** Existing laws often fail to protect victims of trafficking, and because victims are often illegal immigrants in the destination country, they are repeatedly punished more harshly than the traffickers themselves.

**(18)** Additionally, adequate services and facilities do not exist to meet victims' needs regarding health care, housing, education, and legal assistance, which safely reintegrate trafficking victims into their home countries.

**(19)** Victims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation.

**(20)** Because victims of trafficking are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked, because they are often subjected to coercion and intimidation including physical detention and debt bondage, and because they often fear retribution

and forcible removal to countries in which they will face retribution or other hardship, these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes.

**(21)** Trafficking of persons is an evil requiring concerted and vigorous action by countries of origin, transit or destination, and by international organizations.

**(22)** One of the founding documents of the United States, the Declaration of Independence, recognizes the inherent dignity and worth of all people. It states that all men are created equal and that they are endowed by their Creator with certain unalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished. Current practices of sexual slavery and trafficking of women and children are similarly abhorrent to the principles upon which the United States was founded.

**(23)** The United States and the international community agree that trafficking in persons involves grave violations of human rights and is a matter of pressing international concern. The international community has repeatedly condemned slavery and involuntary servitude, violence against women, and

other elements of trafficking, through declarations, treaties, and United Nations resolutions and reports, including the Universal Declaration of Human Rights; the 1956 Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery; the 1948 American Declaration on the Rights and Duties of Man; the 1957 Abolition of Forced Labor Convention; the International Covenant on Civil and Political Rights; the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; United Nations General Assembly Resolutions 50/167, 51/66, and 52/98; the Final Report of the World Congress against Sexual Exploitation of Children (Stockholm, 1996); the Fourth World Conference on Women (Beijing, 1995); and the 1991 Moscow Document of the Organization for Security and Cooperation in Europe.

**(24)** Trafficking in persons is a transnational crime with national implications. To deter international trafficking and bring its perpetrators to justice, nations including the United States must recognize that trafficking is a serious offense. This is done by prescribing appropriate punishment, giving priority to the prosecution of trafficking offenses, and protecting rather than punishing the victims of such offenses. The United States must work bilaterally and multilaterally to abolish the trafficking industry by taking steps to promote

cooperation among countries linked together by international trafficking routes. The United States must also urge the international community to take strong action in multilateral fora to engage recalcitrant countries in serious and sustained efforts to eliminate trafficking and protect trafficking victims.

## VII.    22 U.S.C.A. § 7102

In this chapter:

### (1) Abuse or threatened abuse of law or legal process

The term "abuse or threatened abuse of the legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

### (2) Appropriate congressional committees

The term "appropriate congressional committees" means the Committee on Foreign Relations and the Committee on the Judiciary of the Senate and the Committee on Foreign Affairs and the Committee on the Judiciary of the House of Representatives.

### (3) Coercion

The term "coercion" means--

(A) threats of serious harm to or physical restraint against any person;

**(B)** any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

**(C)** the abuse or threatened abuse of the legal process.

### (4) Commercial sex act

The term "commercial sex act" means any sex act on account of which anything of value is given to or received by any person.

### (5) Concrete actions

The term "concrete actions" means actions that demonstrate increased efforts by the government of a country to meet the minimum standards for the elimination of trafficking, including any of the following:

**(A)** Enforcement actions taken.

**(B)** Investigations actively underway.

**(C)** Prosecutions conducted.

**(D)** Convictions attained.

**(E)** Training provided.

**(F)** Programs and partnerships actively underway.

**(G)** Efforts to prevent severe forms of trafficking, including programs to reduce the vulnerability of particularly vulnerable populations, involving survivors of trafficking in community engagement and policy

making, engagement with foreign migrants, ending recruitment fees, and other such measures.

**(H)** Victim services offered, including immigration services and restitution.

**(I)** The amount of money the government has committed to the actions described in subparagraphs (A) through (H).

**(6) Credible information**

The term "credible information" includes all of the following:

**(A)** Reports by the Department of State.

**(B)** Reports of other Federal agencies, including the Department of Labor's List of Goods Produced by Child Labor or Forced Labor and List of Products Produced by Forced Labor or Indentured Child Labor.

**(C)** Documentation provided by a foreign country, including--

    **(i)** copies of relevant laws, regulations, and policies adopted or modified; and

    **(ii)** an official record of enforcement actions taken, judicial proceedings, training conducted, consultations conducted, programs and partnerships launched, and services provided.

**(D)** Materials developed by civil society organizations.

**(E)** Information from survivors of human trafficking, vulnerable persons, and whistleblowers.

**(F)** All relevant media and academic reports that, in light of reason and common sense, are worthy of belief.

**(G)** Information developed by multilateral institutions.

**(H)** An assessment of the impact of the actions described in subparagraphs (A) through (I) of paragraph (5) on the prevalence of human trafficking in the country.

**(7) Debt bondage**

The term "debt bondage" means the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or of those of a person under his or her control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and nature of those services are not respectively limited and defined.

**(8) Involuntary servitude**

The term "involuntary servitude" includes a condition of servitude induced by means of--

**(A)** any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or

**(B)** the abuse or threatened abuse of the legal process.

### (9) Minimum standards for the elimination of trafficking

The term "minimum standards for the elimination of trafficking" means the standards set forth in section 7106 of this title.

### (10) Nonhumanitarian, nontrade-related foreign assistance

The term "nonhumanitarian, nontrade-related foreign assistance" means--

**(A)** any assistance under the Foreign Assistance Act of 1961, other than--

> **(i)** assistance under chapter 4 of part II of that Act in support of programs of nongovernmental organizations that is made available for any program, project, or activity eligible for assistance under chapter 1 of part I of that Act;

> **(ii)** assistance under chapter 8 of part I of that Act;

> **(iii)** any other narcotics-related assistance under part I of that Act or under chapter 4 or $5^1$ part II of that Act, but any such assistance provided under this clause shall be subject to the prior notification procedures applicable to reprogrammings pursuant to section 634A of that Act;

> **(iv)** disaster relief assistance, including any assistance under chapter 9 of part I of that Act;

**(v)** antiterrorism assistance under chapter 8 of part II of that Act;

**(vi)** assistance for refugees;

**(vii)** humanitarian and other development assistance in support of programs of nongovernmental organizations under chapters 1 and 10[2] of that Act;

**(viii)** programs under title IV of chapter 2 of part I of that Act, relating to the Overseas Private Investment Corporation; and

**(ix)** other programs involving trade-related or humanitarian assistance; and

**(B)** sales, or financing on any terms, under the Arms Export Control Act, other than sales or financing provided for narcotics-related purposes following notification in accordance with the prior notification procedures applicable to reprogrammings pursuant to section 634A of the Foreign Assistance Act of 1961.

**(11) Severe forms of trafficking in persons**

The term "severe forms of trafficking in persons" means--

**(A)** sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

**(B)** the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

### (12) Sex trafficking

The term "sex trafficking" means the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act.

### (13) State

The term "State" means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and territories and possessions of the United States.

### (14) Task Force

The term "Task Force" means the Interagency Task Force to Monitor and Combat Trafficking established under section 7103 of this title.

### (15) United States

The term "United States" means the fifty States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands,

American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, and the territories and possessions of the United States.

### (16) Victim of a severe form of trafficking

The term "victim of a severe form of trafficking" means a person subject to an act or practice described in paragraph (9).

### (17) Victim of trafficking

The term "victim of trafficking" means a person subjected to an act or practice described in paragraph (9) or (10).

## VIII.    22 U.S.C.A. § 7103

### (a) Establishment

The President shall establish an Interagency Task Force to Monitor and Combat Trafficking.

### (b) Appointment

The President shall appoint the members of the Task Force, which shall include the Secretary of State, the Administrator of the United States Agency for International Development, the Attorney General, the Secretary of Labor, the Secretary of Health and Human Services, the Director of National Intelligence, the Secretary of Defense, the Secretary of Homeland Security, the Secretary of Education, the Secretary of Commerce, the Secretary of the Treasury, the United

States Trade Representative, and such other officials as may be designated by the President.

**(c) Chairman**

The Task Force shall be chaired by the Secretary of State.

**(d) Activities of the Task Force**

The Task Force shall carry out the following activities:

**(1)** Coordinate the implementation of this chapter.

**(2)** Measure and evaluate progress of the United States and other countries in the areas of trafficking prevention, protection, and assistance to victims of trafficking, and prosecution and enforcement against traffickers, including the role of public corruption in facilitating trafficking. The Task Force shall have primary responsibility for assisting the Secretary of State in the preparation of the reports described in section 7107 of this title.

**(3)** Expand interagency procedures to collect and organize data, including significant research and resource information on domestic and international trafficking and providing an annual report on the case referrals received from the national human trafficking hotline by Federal departments and agencies. Any data collection procedures and reporting requirements established under this subsection shall respect the confidentiality of victims of trafficking.

**(4)** Engage in efforts to facilitate cooperation among countries of origin, transit, and destination. Such efforts shall aim to strengthen local and regional capacities to prevent trafficking, prosecute traffickers and assist trafficking victims, and shall include initiatives to enhance cooperative efforts between destination countries and countries of origin and assist in the appropriate reintegration of stateless victims of trafficking.

**(5)** Examine the role of the international "sex tourism" industry in the trafficking of persons and in the sexual exploitation of women and children around the world.

**(6)** Engage in consultation and advocacy with governmental and nongovernmental organizations, among other entities, to advance the purposes of this chapter, and make reasonable efforts to distribute information to enable all relevant Federal Government agencies to publicize the National Human Trafficking Resource Center Hotline on their websites, in all headquarters offices, and in all field offices throughout the United States.

**(7)** Not later than May 1, 2004, and annually thereafter, the Attorney General shall submit to the Committee on Ways and Means, the Committee on Foreign Affairs the Committee on Financial Services,,[1] and the Committee on the Judiciary of the House of Representatives and the Committee on Finance, the Committee on Foreign Relations, the Committee on Banking, Housing, and

Urban Affairs, and the Committee on the Judiciary of the Senate, a report on Federal agencies that are implementing any provision of this chapter, or any amendment made by this chapter, which shall include, at a minimum, information on--

**(A)** the number of persons who received benefits or other services under subsections (b) and (f) of section 7105 of this title in connection with programs or activities funded or administered by the Secretary of Health and Human Services, the Secretary of Labor, the Attorney General, the Board of Directors of the Legal Services Corporation, and other appropriate Federal agencies during the preceding fiscal year;

**(B)** the number of persons who have been granted continued presence in the United States under section 7105(c)(3) of this title during the preceding fiscal year and the mean and median time taken to adjudicate applications submitted under such section, including the time from the receipt of an application by law enforcement to the issuance of continued presence, and a description of any efforts being taken to reduce the adjudication and processing time while ensuring the safe and competent processing of the applications;

**(C)** the number of persons who have applied for, been granted, or been denied a visa or otherwise provided status under subparagraph (T)(i) or (U)(i) of section 1101(a)(15) of Title 8 during the preceding fiscal year;

**(D)** the number of persons who have applied for, been granted, or been denied a visa or status under clause (ii) of section 1101(a)(15)(T) of Title 8 during the preceding fiscal year, broken down by the number of such persons described in subclauses (I), (II), and (III) of such clause (ii);

**(E)** the amount of Federal funds expended in direct benefits paid to individuals described in subparagraph (D) in conjunction with T visa status;

**(F)** the number of persons who have applied for, been granted, or been denied a visa or status under section 1101(a)(15)(U)(i) of Title 8 during the preceding fiscal year;

**(G)** the mean and median time in which it takes to adjudicate applications submitted under the provisions of law set forth in subparagraph (C), including the time between the receipt of an application and the issuance of a visa and work authorization;

**(H)** any efforts being taken to reduce the adjudication and processing time, while ensuring the safe and competent processing of the applications;

**(I)** the number of persons who have been charged or convicted under one or more of sections 1581, 1583, 1584, 1589, 1590, 1591, 1592, or 1594 of Title 18 during the preceding fiscal year and the sentences imposed against each such person;

**(J)** the amount, recipient, and purpose of each grant issued by any Federal agency to carry out the purposes of sections 7104 and 7105 of this title, or section 2152d of this title, during the preceding fiscal year;

**(K)** the nature of training conducted pursuant to section 7105(c)(4) of this title during the preceding fiscal year;

**(L)** the amount, recipient, and purpose of each grant under sections 20702 and 20705 of Title 34;

**(M)** activities by the Department of Defense to combat trafficking in persons, including--

> **(i)** educational efforts for, and disciplinary actions taken against, members of the United States Armed Forces;

> **(ii)** the development of materials used to train the armed forces of foreign countries;

**(iii)** all known trafficking in persons cases reported to the Under Secretary of Defense for Personnel and Readiness;

**(iv)** efforts to ensure that United States Government contractors and their employees or United States Government subcontractors and their employees do not engage in trafficking in persons; and

**(v)** all trafficking in persons activities of contractors reported to the Under Secretary of Defense for Acquisition and Sustainment;

**(N)** activities or actions by Federal departments and agencies to enforce--

**(i)** section 7104(g) of this title and any similar law, regulation, or policy relating to United States Government contractors and their employees or United States Government subcontractors and their employees that engage in severe forms of trafficking in persons, the procurement of commercial sex acts, or the use of forced labor, including debt bondage;

**(ii)** section 1307 of Title 19 (relating to prohibition on importation of convict-made goods), including any determinations by the Secretary of Homeland Security to waive the restrictions of such section; and

(iii) prohibitions on the procurement by the United States Government of items or services produced by slave labor, consistent with Executive Order 13107 (December 10, 1998);

(O) the activities undertaken by the Senior Policy Operating Group to carry out its responsibilities under subsection (g); and[2]

(P) the activities undertaken by Federal agencies to train appropriate State, tribal, and local government and law enforcement officials to identify victims of severe forms of trafficking, including both sex and labor trafficking;

(Q) the activities undertaken by Federal agencies in cooperation with State, tribal, and local law enforcement officials to identify, investigate, and prosecute offenses under sections 1581, 1583, 1584, 1589, 1590, 1591, 1592, 1594, 2251, 2251A, 2421, 2422, and 2423 of Title 18, or equivalent State offenses, including, in each fiscal year--

(i) the number, age, gender, country of origin, and citizenship status of victims identified for each offense;

(ii) the number of individuals charged, and the number of individuals convicted, under each offense;

**(iii)** the number of individuals referred for prosecution for State offenses, including offenses relating to the purchasing of commercial sex acts;

**(iv)** the number of victims granted continued presence in the United States under section 7105(c)(3) of this title;

**(v)** the number of victims granted a visa or otherwise provided status under subparagraph (T)(i) or (U)(i) of section 1101(a)(15) of Title 8;

**(vi)** the number of individuals required by a court order to pay restitution in connection with a violation of each offense under Title 18, the amount of restitution required to be paid under each such order, and the amount of restitution actually paid pursuant to each such order;

**(vii)** the age, gender, race, country of origin, country of citizenship, and description of the role in the offense of individuals convicted under each offense;

**(viii)** the number of convictions obtained under chapter 77 of Title 18 aggregated separately by the form of offense committed with respect to the victim, including recruiting, enticing, harboring, transporting, providing, obtaining, advertising,

maintaining, patronizing, or soliciting a human trafficking victim; and[2]

**(R)** the activities undertaken by the Department of Justice and the Department of Health and Human Services to meet the specific needs of minor victims of domestic trafficking, including actions taken pursuant to subsection (f) and section 20702(a) of Title 34, and the steps taken to increase cooperation among Federal agencies to ensure the effective and efficient use of programs for which the victims are eligible; and

**(S)**[3]tactics and strategies employed by human trafficking task forces sponsored by the Department of Justice to reduce demand for trafficking victims.

**(S)**[3]the efforts of the United States to eliminate money laundering related to human trafficking and the number of investigations, arrests, indictments, and convictions in money laundering cases with a nexus to human trafficking.

## (e) Office to Monitor and Combat Trafficking

### (1) In general

The Secretary of State shall establish within the Department of State an Office to Monitor and Combat Trafficking, which shall provide assistance to the Task Force. Any such Office shall be headed by a Director, who shall be

appointed by the President, by and with the advice and consent of the Senate, with the rank of Ambassador-at-Large. The Director shall have the primary responsibility for assisting the Secretary of State in carrying out the purposes of this chapter and may have additional responsibilities as determined by the Secretary. The Director shall consult with nongovernmental organizations and multilateral organizations, and with trafficking victims or other affected persons. The Director shall have the authority to take evidence in public hearings or by other means. The agencies represented on the Task Force are authorized to provide staff to the Office on a nonreimbursable basis.

**(2) United States assistance**

The Director shall be responsible for--

**(A)** all policy, funding, and programming decisions regarding funds made available for trafficking in persons programs that are centrally controlled by the Office to Monitor and Combat Trafficking; and

**(B)** coordinating any trafficking in persons programs of the Department of State or the United States Agency for International Development that are not centrally controlled by the Director.

**(f) Regional strategies for combating trafficking in persons**

Each regional bureau in the Department of State shall contribute to the realization of the anti-trafficking goals and objectives of the Secretary of State. Each

year, in cooperation with the Office to Monitor and Combat Trafficking in Persons, each regional bureau shall submit a list of anti-trafficking goals and objectives to the Secretary of State for each country in the geographic area of responsibilities of the regional bureau. Host governments shall be informed of the goals and objectives for their particular country and, to the extent possible, host government officials should be consulted regarding the goals and objectives.

**(g) Senior Policy Operating Group**

**(1) Establishment**

There shall be established within the executive branch a Senior Policy Operating Group.

**(2) Membership; related matters**

**(A) In general**

The Operating Group shall consist of the senior officials designated as representatives of the appointed members of the Task Force (pursuant to Executive Order No. 13257 of February 13, 2002).

**(B) Chairperson**

The Operating Group shall be chaired by the Director of the Office to Monitor and Combat Trafficking of the Department of State.

**(C) Meetings**

The Operating Group shall meet on a regular basis at the call of the Chairperson.

**(3) Duties**

The Operating Group shall coordinate activities of Federal departments and agencies regarding policies (including grants and grant policies) involving the international trafficking in persons and the implementation of this chapter.

**(4) Availability of information**

Each Federal department or agency represented on the Operating Group shall fully share all information with such Group regarding the department or agency's plans, before and after final agency decisions are made, on all matters relating to grants, grant policies, and other significant actions regarding the international trafficking in persons and the implementation of this chapter.

**(5) Regulations**

Not later than 90 days after December 19, 2003, the President shall promulgate regulations to implement this section, including regulations to carry out paragraph (4).

**IX.    22 U.S.C.A. § 7103a**

**(a) Declaration of purpose**

The purpose of this section is to promote collaboration and cooperation--

**(1)** between the United States Government and governments listed on the annual Trafficking in Persons Report;

**(2)** between foreign governments and civil society actors; and

**(3)** between the United States Government and private sector entities.

## (b) Partnerships

The Director of the office established pursuant to section 7103(e)(1) of this title, in coordination and cooperation with other officials at the Department of State, officials at the Department of Labor, and other relevant officials of the United States Government, shall promote, build, and sustain partnerships between the United States Government and private entities, including foundations, universities, corporations, community-based organizations, and other nongovernmental organizations, to ensure that--

**(1)** United States citizens do not use any item, product, or material produced or extracted with the use and labor from victims of severe forms of trafficking; and

**(2)** such entities do not contribute to trafficking in persons involving sexual exploitation.

## (c) Program to address emergency situations

The Secretary of State, acting through the Director established pursuant to section 7103(e)(1) of this title, is authorized to establish a fund to assist foreign

governments in meeting unexpected, urgent needs in prevention of trafficking in persons, protection of victims, and prosecution of trafficking offenders.

**(d) Child protection compacts**

**(1) In general**

The Secretary of State, in consultation with the Administrator of the United States Agency for International Development, the Secretary of Labor, and the heads of other relevant agencies, is authorized to provide assistance under this section for each country that enters into a child protection compact with the United States to support policies and programs that--

**(A)** prevent and respond to violence, exploitation, and abuse against children; and

**(B)** measurably reduce the trafficking of minors by building sustainable and effective systems of justice, prevention, and protection.

**(2) Elements**

A child protection compact under this subsection shall establish a multi-year plan for achieving shared objectives in furtherance of the purposes of this chapter. The compact should take into account, if applicable, the national child protection strategies and national action plans for human trafficking of a country, and shall describe--

**(A)** the specific objectives the foreign government and the United States Government expect to achieve during the term of the compact;

**(B)** the responsibilities of the foreign government and the United States Government in the achievement of such objectives;

**(C)** the particular programs or initiatives to be undertaken in the achievement of such objectives and the amount of funding to be allocated to each program or initiative by both countries;

**(D)** regular outcome indicators to monitor and measure progress toward achieving such objectives;

**(E)** a multi-year financial plan, including the estimated amount of contributions by the United States Government and the foreign government, and proposed mechanisms to implement the plan and provide oversight;

**(F)** how a country strategy will be developed to sustain progress made toward achieving such objectives after expiration of the compact; and

**(G)** how child protection data will be collected, tracked, and managed to provide strengthened case management and policy planning.

## (3) Form of assistance

Assistance under this subsection may be provided in the form of grants, cooperative agreements, or contracts to or with national governments,

regional or local governmental units, or non-governmental organizations or private entities with expertise in the protection of victims of severe forms of trafficking in persons.

**(4) Eligible countries**

The Secretary of State, in consultation with the agencies set forth in paragraph (1) and relevant officers of the Department of Justice, shall select countries with which to enter into child protection compacts. The selection of countries under this paragraph shall be based on--

> **(A)** the selection criteria set forth in paragraph (5); and

> **(B)** objective, documented, and quantifiable indicators, to the maximum extent possible.

**(5) Selection criteria**

A country shall be selected under paragraph (4) on the basis of criteria developed by the Secretary of State in consultation with the Administrator of the United States Agency for International Development and the Secretary of Labor. Such criteria shall include--

> **(A)** a documented high prevalence of trafficking in persons within the country; and

> **(B)** demonstrated political motivation and sustained commitment by the government of such country to undertake meaningful measures to

address severe forms of trafficking in persons, including prevention, protection of victims, and the enactment and enforcement of anti-trafficking laws against perpetrators.

**(6) Suspension and termination of assistance**

**(A) In general**

The Secretary may suspend or terminate assistance provided under this subsection in whole or in part for a country or entity if the Secretary determines that--

**(i)** the country or entity is engaged in activities that are contrary to the national security interests of the United States;

**(ii)** the country or entity has engaged in a pattern of actions inconsistent with the criteria used to determine the eligibility of the country or entity, as the case may be; or

**(iii)** the country or entity has failed to adhere to its responsibilities under the Compact.

**(B) Reinstatement**

The Secretary may reinstate assistance for a country or entity suspended or terminated under this paragraph only if the Secretary determines that the country or entity has demonstrated a commitment to correcting each

condition for which assistance was suspended or terminated under subparagraph (A).

## X.    22 U.S.C.A. § 7104

### (a) Economic alternatives to prevent and deter trafficking

The President shall establish and carry out international initiatives to enhance economic opportunity for potential victims of trafficking as a method to deter trafficking. Such initiatives may include--

**(1)** microcredit lending programs, training in business development, skills training, and job counseling;

**(2)** programs to promote women's participation in economic decisionmaking;

**(3)** programs to keep children, especially girls, in elementary and secondary schools, and to educate persons who have been victims of trafficking;

**(4)** development of educational curricula regarding the dangers of trafficking; and

**(5)** grants to nongovernmental organizations to accelerate and advance the political, economic, social, and educational roles and capacities of women in their countries.

### (b) Public awareness and information

#### (1) In general

The President, acting through the Secretary of Labor, the Secretary of Health and Human Services, the Attorney General, and the Secretary of State, shall establish and carry out programs to increase public awareness, particularly among potential victims of trafficking, of the dangers of trafficking and the protections that are available for victims of trafficking.

**(2) Grants to assist in the recognition of trafficking**

**(A) Definitions**

In this paragraph:

**(i) ESEA terms**

The terms "elementary school", "local educational agency", "other staff", and "secondary school" have the meanings given the terms in section 7801 of Title 20.

**(ii) High-intensity child sex trafficking area**

The term "high-intensity child sex trafficking area" means a metropolitan area designated by the Director of the Federal Bureau of Investigation as having a high rate of children involved in sex trafficking.

**(iii) Labor trafficking**

The term "labor trafficking" means conduct described in section 7102(9)(B) of this title.

ADD -45

**(iv) School staff**

The term "school staff" means teachers, nurses, school leaders and administrators, and other staff at elementary schools and secondary schools.

**(v) Sex trafficking**

The term "sex trafficking" means the conduct described in section 7102(9)(A) of this title.

**(B) In general**

The Secretary of Health and Human Services, in consultation with the Secretary of Education and the Secretary of Labor, may award grants to local educational agencies, in partnership with a nonprofit, nongovernmental agency, to establish, expand, and support programs--

**(i)** to educate school staff to recognize and respond to signs of labor trafficking and sex trafficking; and

**(ii)** to provide age-appropriate information to students on how to avoid becoming victims of labor trafficking and sex trafficking.

**(C) Program requirements**

Amounts awarded under this paragraph shall be used for--

**(i)** education regarding--

**(I)** avoiding becoming victims of labor trafficking and sex trafficking;

**(II)** indicators that an individual is a victim or potential victim of labor trafficking or sex trafficking;

**(III)** options and procedures for referring such an individual, as appropriate, to information on such trafficking and services available for victims of such trafficking;

**(IV)** reporting requirements and procedures in accordance with applicable Federal and State law; and

**(V)** how to carry out activities authorized under subparagraph (A)(ii); and

**(ii)** a plan, developed and implemented in consultation with local law enforcement agencies, to ensure the safety of school staff and students reporting such trafficking.

**(D) Priority**

In awarding grants under this paragraph, the Secretary shall give priority to local educational agencies serving a high-intensity child sex trafficking area.

**(c) Border interdiction**

The President shall establish and carry out programs of border interdiction outside the United States. Such programs shall include providing grants to foreign nongovernmental organizations that provide for transit shelters operating at key border crossings and that help train survivors of trafficking in persons to educate and train border guards and officials, and other local law enforcement officials, to identify traffickers and victims of severe forms of trafficking, and the appropriate manner in which to treat such victims. Such programs shall also include, to the extent appropriate, monitoring by such survivors of trafficking in persons of the implementation of border interdiction programs, including helping in the identification of such victims to stop the cross-border transit of victims. The President shall ensure that any program established under this subsection provides the opportunity for any trafficking victim who is freed to return to his or her previous residence if the victim so chooses.

**(d) International media**

The President shall establish and carry out programs that support the production of television and radio programs, including documentaries, to inform vulnerable populations overseas of the dangers of trafficking, and to increase awareness of the public in countries of destination regarding the slave-like practices and other human rights abuses involved in trafficking, including fostering linkages

between individuals working in the media in different countries to determine the best methods for informing such populations through such media.

**(e) Combating international sex tourism**

    **(1) Development and dissemination of materials**

    The President, pursuant to such regulations as may be prescribed, shall ensure that materials are developed and disseminated to alert travelers that sex tourism (as described in subsections (b) through (f) of section 2423 of Title 18) is illegal, will be prosecuted, and presents dangers to those involved. Such materials shall be disseminated to individuals traveling to foreign destinations where the President determines that sex tourism is significant.

    **(2) Monitoring of compliance**

    The President shall monitor compliance with the requirements of paragraph (1).

    **(3) Feasibility report**

    Not later than 180 days after December 19, 2003, the President shall transmit to the Committee on International Relations of the House of Representatives and the Committee on Foreign Affairs of the Senate a report that describes the feasibility of such United States Government materials being disseminated

through public-private partnerships to individuals traveling to foreign destinations.

**(f) Consultation requirement**

The President shall consult with appropriate nongovernmental organizations with respect to the establishment and conduct of initiatives and programs described in subsections (a) through (e).

**(g) Termination of certain grants, contracts and cooperative agreements**

The President shall ensure that any grant, contract, or cooperative agreement provided or entered into by a Federal department or agency under which funds are to be provided to a private entity, in whole or in part, shall include a condition that authorizes the department or agency to terminate the grant, contract, or cooperative agreement, or take any of the other remedial actions authorized under section 7104b(c) of this title, without penalty, if the grantee or any subgrantee, or the contractor or any subcontractor, engages in, or uses labor recruiters, brokers, or other agents who engage in--

**(1)** severe forms of trafficking in persons;

**(2)** the procurement of a commercial sex act during the period of time that the grant, contract, or cooperative agreement is in effect;

**(3)** the use of forced labor in the performance of the grant, contract, or cooperative agreement; or

**(4)** acts that directly support or advance trafficking in persons, including the following acts:

**(A)** Destroying, concealing, removing, confiscating, or otherwise denying an employee access to that employee's identity or immigration documents.

**(B)** Failing to provide return transportation or pay for return transportation costs to an employee from a country outside the United States to the country from which the employee was recruited upon the end of employment if requested by the employee, unless--

**(i)** exempted from the requirement to provide or pay for such return transportation by the Federal department or agency providing or entering into the grant, contract, or cooperative agreement; or

**(ii)** the employee is a victim of human trafficking seeking victim services or legal redress in the country of employment or a witness in a human trafficking enforcement action.

**(C)** Soliciting a person for the purpose of employment, or offering employment, by means of materially false or fraudulent pretenses, representations, or promises regarding that employment.

**(D)** Charging recruited employees placement or recruitment fees.

**(E)** Providing or arranging housing that fails to meet the host country housing and safety standards.

**(h) Prevention of trafficking in conjunction with post-conflict and humanitarian emergency assistance**

The United States Agency for International Development, the Department of State, and the Department of Defense shall incorporate anti-trafficking and protection measures for vulnerable populations, particularly women and children, into their post-conflict and humanitarian emergency assistance and program activities.

**(i) Additional measures to prevent and deter trafficking**

The President shall establish and carry out programs to prevent and deter trafficking in persons, including--

**(1)** technical assistance and other support to improve the capacity of foreign governments to investigate, identify, and carry out inspections of private entities, including labor recruitment centers, at which trafficking victims may be exploited, particularly exploitation involving forced and child labor;

**(2)** technical assistance and other support for foreign governments and nongovernmental organizations to provide immigrant populations with information, in the native languages of the major immigrant groups of such

populations, regarding the rights of such populations in the foreign country and local in-country nongovernmental organization-operated hotlines;

**(3)** technical assistance to provide legal frameworks and other programs to foreign governments and nongovernmental organizations to ensure that--

> **(A)** foreign migrant workers are provided the same protection as nationals of the foreign country;
>
> **(B)** labor recruitment firms are regulated; and
>
> **(C)** workers providing domestic services in households are provided protection under labor rights laws; and

**(4)** assistance to foreign governments to register vulnerable populations as citizens or nationals of the country to reduce the ability of traffickers to exploit such populations.

## (j) Prevention of child trafficking through child marriage

The Secretary of State shall establish and implement a multi-year, multi-sectoral strategy--

**(1)** to prevent child marriage;

**(2)** to promote the empowerment of girls at risk of child marriage in developing countries;

**(3)** that should address the unique needs, vulnerabilities, and potential of girls younger than 18 years of age in developing countries;

**(4)** that targets areas in developing countries with high prevalence of child marriage; and

**(5)** that includes diplomatic and programmatic initiatives.

**(k) Agency action to prevent funding of human trafficking**

**(1) In general**

At the end of each fiscal year, the Secretary of State, the Secretary of Labor, the Administrator of the United States Agency for International Development, and the Director of the Office of Management and Budget shall each submit a report to the Administrator of General Services that includes--

**(A)** the name and contact information of the individual within the agency's Office of Legal Counsel or Office of Acquisition Policy who is responsible for overseeing the implementation of--

**(i)** subsection (g);

**(ii)** title XVII of the National Defense Authorization Act for Fiscal Year 2013 (22 U.S.C. 7104a et seq.); and

**(iii)** any regulation in the Federal Acquisition Regulation (48 C.F.R. 1 et seq.) that is related to any subject matter referred to in clause (i) or (ii);

**(B)** agency action to ensure that contractors are educated on the applicable laws and regulations listed in subparagraph (A);

**(C)** agency action to ensure that the acquisition workforce and agency officials understand implementation of the laws and regulations listed in subparagraph (A), including best practices for--

> **(i)** ensuring compliance with such laws and regulations;

> **(ii)** assessing the serious, repeated, willful, or pervasive nature of any violation of such laws or regulations; and

> **(iii)** evaluating steps contractors have taken to correct any such violation;

**(D)(i)** the number of contracts containing language referring to the laws and regulations listed in subparagraph (A); and

**(ii)** the number of contracts that did not contain any language referring to such laws and regulations;

**(E)(i)** the number of allegations of severe forms of trafficking in persons received; and

**(ii)** the source type of the allegation (such as contractor, subcontractor, employee of contractor or subcontractor, or an individual outside of the contract);

**(F)(i)** the number of such allegations investigated by the agency;

**(ii)** a summary of any findings from such investigations; and

**(iii)** any improvements recommended by the agency to prevent such conduct from recurring;

**(G)(i)** the number of such allegations referred to the Attorney General for prosecution under section 3271 of Title 18; and

**(ii)** the outcomes of such referrals;

**(H)** any remedial action taken as a result of such investigation, including whether--

**(i)** a contractor or subcontractor (at any tier) was debarred or suspended due to a violation of a law or regulation relating to severe forms of trafficking in persons; or

**(ii)** a contract was terminated pursuant to subsection (g) as a result of such violation;

**(I)** any other assistance offered to agency contractors to ensure compliance with a law or regulation relating to severe forms of trafficking in persons;

**(J)** any interagency meetings or data sharing regarding suspended or disbarred contractors or subcontractors (at any tier) for severe forms of trafficking in persons; and

**(K)** any contract with a contractor or subcontractor (at any tier) located outside the United States and the country location, where safe to reveal location, for each such contractor or subcontractor.

**(2) Appropriate congressional committees**

In this subsection, the term "appropriate congressional committees" means--

**(A)** the Committee on Foreign Affairs of the House of Representatives;

**(B)** the Committee on Armed Services of the House of Representatives;

**(C)** the Committee on Education and the Workforce of the House of Representatives;

**(D)** the Committee on the Judiciary of the House of Representatives;

**(E)** the Committee on Oversight and Government Reform of the House of Representatives;

**(F)** the Committee on Foreign Relations of the Senate;

**(G)** the Committee on Armed Services of the Senate;

**(H)** the Committee on the Judiciary of the Senate; and

**(I)** the Committee on Health, Education, Labor, and Pensions of the Senate.

## XI.    22 U.S.C.A. § 7104a

**(a) Requirement**

The head of an executive agency may not provide or enter into a grant, contract, or cooperative agreement if the estimated value of the services required to be performed under the grant, contract, or cooperative agreement outside the United States exceeds $500,000, unless a duly designated representative of the recipient of such grant, contract, or cooperative agreement certifies to the contracting or grant officer prior to receiving an award and on an annual basis thereafter, after having conducted due diligence, that--

**(1)** the recipient has implemented a plan to prevent the activities described in section 7104(g) of this title, and is in compliance with that plan;

**(2)** the recipient has implemented procedures to prevent any activities described in such section 7104(g) and to monitor, detect, and terminate any subcontractor, subgrantee, or employee of the recipient engaging in any activities described in such section; and

**(3)** to the best of the representative's knowledge, neither the recipient, nor any subcontractor or subgrantee of the recipient or any agent of the recipient or of such a subcontractor or subgrantee, is engaged in any of the activities described in such section.

**(b) Limitation**

Any plan or procedures implemented pursuant to subsection (a) shall be appropriate to the size and complexity of the grant, contract, or cooperative agreement and to the nature and scope of its activities, including the number of non-United States citizens expected to be employed.

**(c) Disclosure**

The recipient shall provide a copy of the plan to the contracting or grant officer upon request, and as appropriate, shall post the useful and relevant contents of the plan or related materials on its website and at the workplace.

**(d) Guidance**

The President, in consultation with the Secretary of State, the Attorney General, the Secretary of Defense, the Secretary of Labor, the Secretary of Homeland Security, the Administrator for the United States Agency for International Development, and the heads of such other executive agencies as the President deems appropriate, shall establish minimum requirements for contractor plans and procedures to be implemented pursuant to this section.

## XII.    22 U.S.C.A. § 7104b

### (a) Referral and investigation

#### (1) Referral

If the contracting or grant officer of an executive agency for a grant, contract, or cooperative agreement receives credible information that a recipient of the grant, contract, or cooperative agreement; any subgrantee or subcontractor of the recipient; or any agent of the recipient or of such a subgrantee or subcontractor, has engaged in an activity described in section 7104(g) of this title, including a report from a contracting officer representative, an auditor, an alleged victim or victim's representative, or any other credible source, the contracting or grant officer shall promptly refer the matter to the agency's Office of Inspector General for investigation. The contracting officer may also direct the contractor to take specific steps to abate an alleged violation or enforce the requirements of a compliance plan implemented pursuant to section 7104a of this title.

#### (2) Investigation

An Inspector General who receives a referral under paragraph (1) or otherwise receives credible information that a recipient of the grant, contract, or cooperative agreement; any subgrantee or subcontractor of the recipient; or any agent of the recipient or of such a subgrantee or subcontractor, has

engaged in an activity described in section 7104(g) of this title, shall promptly review the referral or information and determine whether to initiate an investigation of the matter. In the event that an Inspector General does not initiate an investigation, the Inspector General shall document the rationale for the decision not to investigate.

**(3) Criminal investigation**

If the matter is referred to the Department of Justice for criminal prosecution, the Inspector General may suspend any investigation under this subsection pending the outcome of the criminal prosecution. The Inspector General shall notify the head of the executive agency that awarded the contract, grant, or cooperative agreement of an indictment, information, or criminal complaint against the recipient of a contract, grant, or cooperative agreement; any subgrantee or subcontractor of the recipient; or any agent of the recipient or of a subgrantee or subcontractor. If the criminal investigation results in a decision not to prosecute, the Inspector General shall promptly determine whether to resume any investigation that was suspended pursuant to this paragraph. In the event that an Inspector General does not resume an investigation, the Inspector General shall document the rationale for the decision.

**(b) Report**

Upon completion of an investigation under subsection (a), the Inspector General shall submit a report on the investigation to the head of the executive agency that awarded the contract, grant, or cooperative agreement. The report shall include the Inspector General's conclusions regarding whether or not any allegations that the recipient of a grant, contract, or cooperative agreement; any subcontractor or subgrantee of the recipient; or any agent of the recipient or of such a subcontractor or subgrantee, engaged in any of the activities described in section 7104(g) of this title, are substantiated.

**(c) Remedial actions**

**(1) In general**

Upon receipt of an Inspector General's report substantiating an allegation that the recipient of a contract, grant, or cooperative agreement; any subgrantee or subcontractor of the recipient; or any agent of the recipient or of a subgrantee or subcontractor, engaged in any of the activities described in section 7104(g) of this title, or notification of an indictment, information, or criminal complaint for an offense under subsection (a)(3), the head of agency shall consider taking one or more of the following remedial actions:

**(A)** Requiring the recipient to remove an employee from the performance of work under the grant, contract, or cooperative agreement.

**(B)** Requiring the recipient to terminate a subcontract or subgrant.

**(C)** Suspending payments under the grant, contract, or cooperative agreement until such time as the recipient of the grant, contract, or cooperative agreement has taken appropriate remedial action.

**(D)** Withholding award fees, consistent with the award fee plan, for the performance period in which the agency determined the contractor or subcontractor engaged in any of the activities described in such section 7104(g).

**(E)** Declining to exercise available options under the contract.

**(F)** Terminating the contract for default or cause, in accordance with the termination clause for the contract.

**(G)** Referring the matter to the agency suspension and debarment official.

## (2) Savings clause

Nothing in this subsection shall be construed as limiting the scope of applicable remedies available to the Federal Government.

**(3) Mitigating factor**

Where applicable, the head of an executive agency may consider whether the contractor or grantee had a plan in place under section 7104a of this title, and was in compliance with that plan at the time of the violation, as a mitigating factor in determining which remedies, if any, should apply.

**(4) Aggravating factor**

Where applicable, the head of an executive agency may consider the failure of a contractor or grantee to abate an alleged violation or enforce the requirements of a compliance plan when directed by a contracting officer pursuant to subsection (a)(1) as an aggravating factor in determining which remedies, if any, should apply.

**(d) Inclusion of report conclusions in FAPIIS**

**(1) In general**

The head of an executive agency shall ensure that any substantiated allegation in the report under subsection (b) is included in the Federal Awardee Performance and Integrity Information System (FAPIIS) and that the contractor has an opportunity to respond to any such report in accordance with applicable statutes and regulations.

**(2) Omitted**

### XIII.   22 U.S.C.A. § 7104c

The head of an executive agency making or awarding a grant, contract, or cooperative agreement shall require that the recipient of the grant, contract, or cooperative agreement--

**(1)** immediately inform the Inspector General of the executive agency of any information it receives from any source that alleges credible information that the recipient; any subcontractor or subgrantee of the recipient; or any agent of the recipient or of such a subcontractor or subgrantee, has engaged in conduct described in section 7104(g) of this title; and
**(2)** fully cooperate with any Federal agencies responsible for audits, investigations, or corrective actions relating to trafficking in persons.

### XIV.   22 U.S.C.A. § 7104d

### a) Liability

Excluding section 1706, nothing in this title shall be construed to supersede, enlarge, or diminish the common law or statutory liabilities of any grantee, subgrantee, contractor, subcontractor, or other party covered by section 106(g) of the Trafficking Victims Protection Act of 2000 (22 U.S.C. 7104(g)), as amended by section 1702.

### (b) Authority of Department of Justice

Nothing in this title shall be construed as diminishing or otherwise modifying the authority of the Attorney General to investigate activities covered by this title.

### (c) Implementation and effective dates

### (1) Contracting requirements

ADD -65

**(A)** Not later than 270 days after January 2, 2013, the Federal Acquisition Regulation shall be amended to carry out the requirements of sections 1702, 1703, and 1704(c), and the second sentence of section 1704(a)(1), of this title.

**(B)** The requirements of sections 1702, 1703, and 1704(c), and the second sentence of section 1704(a)(1), of this title, shall apply to grants, contracts, and cooperative agreements entered into on or after the date that is 270 days after January 2, 2013, and to task and delivery orders awarded on or after such date pursuant to contracts entered before, on, or after such date.

## (2) Investigative and procedural requirements

Federal agencies shall implement the requirements of sections 1704, 1705, and 1707 (other than subsection (c) of section 1704) not later than 90 days after January 2, 2013.

## (3) Criminal law changes

The amendments made by section 1706 shall take effect upon the date of enactment and shall apply to conduct taking place on or after such date.

## XV.    22 U.S.C.A. § 7104e

### (a) In general

The Secretary of State shall ensure that each diplomatic or consular post or other mission designates an employee to be responsible for receiving information from--

**(1)** any person who was a victim of a severe form of trafficking in persons (as such term is defined in section 7102(14) of this title) while present in the United States; or

**(2)** any person who has information regarding a victim described in paragraph (1).

**(b) Provision of information**

Any information received pursuant to subsection (a) shall be transmitted to the Department of Justice, the Department of Labor, the Department of Homeland Security, and to any other relevant Federal agency for appropriate response. The Attorney General, the Secretary of Labor, the Secretary of Homeland Security, and the head of any other such relevant Federal agency shall establish a process to address any actions to be taken in response to such information.

**(c) Assistance from foreign governments**

The employee designated for receiving information pursuant to subsection (a) should coordinate with foreign governments or civil society organizations in the countries of origin of victims of severe forms of trafficking in persons, with the

permission of and without compromising the safety of such victims, to ensure that such victims receive any additional support available.

## XVI.    22 U.S.C.A. § 7105

### (a) Assistance for victims in other countries

#### (1) In general

The Secretary of State and the Administrator of the United States Agency for International Development, in consultation with appropriate nongovernmental organizations, shall establish and carry out programs and initiatives in foreign countries to assist in the safe integration, reintegration, or resettlement, as appropriate, of victims of trafficking. Such programs and initiatives shall be designed to meet the appropriate assistance needs of such persons and their children, as identified by the Task Force, and shall be carried out in a manner which takes into account the cross-border, regional, and transnational aspects of trafficking in persons. In addition, such programs and initiatives shall, to the maximum extent practicable, include the following:

> **(A)** Support for local in-country nongovernmental organization-operated hotlines, culturally and linguistically appropriate protective shelters, and regional and international nongovernmental organization networks and databases on trafficking, including support to assist

nongovernmental organizations in establishing service centers and systems that are mobile and extend beyond large cities.

**(B)** Support for nongovernmental organizations and advocates to provide legal, social, and other services and assistance to trafficked individuals, particularly those individuals in detention, and by facilitating contact between relevant foreign government agencies and such nongovernmental organizations to facilitate cooperation between the foreign governments and such organizations.

**(C)** Education and training for trafficked women and girls.

**(D)** The safe integration or reintegration of trafficked individuals into an appropriate community or family, with full respect for the wishes, dignity, and safety of the trafficked individual.

**(E)** Support for developing or increasing programs to assist families of victims in locating, repatriating, and treating their trafficked family members, in assisting the voluntary repatriation of these family members or their integration or resettlement into appropriate communities, and in providing them with treatment.

**(F)** In cooperation and coordination with relevant organizations, such as the United Nations High Commissioner for Refugees, the International Organization for Migration, and private nongovernmental

organizations that contract with, or receive grants from, the United States Government to assist refugees and internally displaced persons, support for--

> **(i)** increased protections for refugees and internally displaced persons, including outreach and education efforts to prevent such refugees and internally displaced persons from being exploited by traffickers; and

> **(ii)** performance of best interest determinations for unaccompanied and separated children who come to the attention of the United Nations High Commissioner for Refugees, its partner organizations, or any organization that contracts with the Department of State in order to identify child trafficking victims and to assist their safe integration, reintegration, and resettlement.

**(2) Additional requirement**

In establishing and conducting programs and initiatives described in paragraph (1), the Secretary of State and the Administrator of the United States Agency for International Development shall take all appropriate steps to enhance cooperative efforts among foreign countries, including countries of origin of victims of trafficking, to assist in the integration, reintegration, or

resettlement, as appropriate, of victims of trafficking, including stateless victims. In carrying out this paragraph, the Secretary and the Administrator shall take all appropriate steps to ensure that cooperative efforts among foreign countries are undertaken on a regional basis and shall brief Congress annually on such efforts.

## (b) Victims in the United States

### (1) Assistance

#### (A) Eligibility for benefits and services

Notwithstanding title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, an alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, shall be eligible for benefits and services under any Federal or State program or activity funded or administered by any official or agency described in subparagraph (B) to the same extent as an alien who is admitted to the United States as a refugee under section 1157 of Title 8.

#### (B) Requirement to expand benefits and services

**(i) In general**

Subject to subparagraph (C) and, in the case of nonentitlement programs, to the availability of appropriations, the Secretary of Health and Human Services, the Secretary of Labor, the Board of Directors of the Legal Services Corporation, and the heads of other Federal agencies shall expand benefits and services to victims of severe forms of trafficking in persons in the United States, and aliens classified as a nonimmigrant under section 1101(a)(15)(T)(ii) of Title 8, without regard to the immigration status of such victims. In the case of nonentitlement programs funded by the Secretary of Health and Human Services, such benefits and services may include services to assist potential victims of trafficking in achieving certification and to assist minor dependent children of victims of severe forms of trafficking in persons or potential victims of trafficking.

**(ii) National human trafficking hotline**

Beginning in fiscal year 2017, and in each fiscal year thereafter, the Secretary of Health and Human Services shall make grants for a national communication system to assist victims of severe forms of trafficking in persons in communicating with service

providers. The Secretary shall give priority to grant applicants that have experience in providing telephone services to victims of severe forms of trafficking in persons. The number of the national human trafficking hotline described in this clause shall be posted in a visible place in all Federal buildings.

**(C) Definition of victim of a severe form of trafficking in persons**

For the purposes of this paragraph, the term "victim of a severe form of trafficking in persons" means only a person--

**(i)** who has been subjected to an act or practice described in section 7102(8) of this title as in effect on October 28, 2000; and

**(ii)(I)** who has not attained 18 years of age; or

**(II)** who is the subject of a certification under subparagraph (E).

**(D) Repealed. Pub.L. 108-193, § 6(a)(2), Dec. 19, 2003, 117 Stat. 2880.**

**(E) Certification**

**(i) In general**

Subject to clause (ii), the certification referred to in subparagraph (C) is a certification by the Secretary of Health and Human Services, after consultation with the Secretary of Homeland Security, that the person referred to in subparagraph (C)(ii)(II)--

**(I)** is willing to assist in every reasonable way in the investigation and prosecution of severe forms of trafficking in persons or is unable to cooperate with such a request due to physical or psychological trauma; and

**(II)(aa)** has made a bona fide application for a visa under section 1101(a)(15)(T) of Title 8, as added by subsection (e), that has not been denied; or

**(bb)** is a person whose continued presence in the United States the Secretary of Homeland Security is ensuring in order to effectuate prosecution of traffickers in persons.

**(ii) Period of effectiveness**

A certification referred to in subparagraph (C), with respect to a person described in clause (i)(II)(bb), shall be effective only for so long as the Secretary of Homeland Security determines that the continued presence of such person is necessary to effectuate prosecution of traffickers in persons.

**(iii) Investigation and prosecution defined**

For the purpose of a certification under this subparagraph, the term "investigation and prosecution" includes--

**(I)** identification of a person or persons who have committed severe forms of trafficking in persons;

**(II)** location and apprehension of such persons;

**(III)** testimony at proceedings against such persons; or

**(IV)** responding to and cooperating with requests for evidence and information.

### (iv) Assistance to investigations

In making the certification described in this subparagraph with respect to the assistance to investigation or prosecution described in clause (i)(I), the Secretary of Health and Human Services shall consider statements from State and local law enforcement officials that the person referred to in subparagraph (C)(ii)(II) has been willing to assist in every reasonable way with respect to the investigation and prosecution of State and local crimes such as kidnapping, rape, slavery, or other forced labor offenses, where severe forms of trafficking appear to have been involved.

## (F) No requirement of official certification for United States citizens and lawful permanent residents

Nothing in this section may be construed to require United States citizens or lawful permanent residents who are victims of severe forms

of trafficking to obtain an official certification from the Secretary of Health and Human Services in order to access any of the specialized services described in this subsection or any other Federal benefits and protections to which they are otherwise entitled.

**(G) Eligibility for interim assistance of children**

**(i) Determination**

Upon receiving credible information that a child described in subparagraph (C)(ii)(I) who is seeking assistance under this paragraph may have been subjected to a severe form of trafficking in persons, the Secretary of Health and Human Services shall promptly determine if the child is eligible for interim assistance under this paragraph. The Secretary shall have exclusive authority to make interim eligibility determinations under this clause. A determination of interim eligibility under this clause shall not affect the independent determination whether a child is a victim of a severe form of trafficking.

**(ii) Notification**

The Secretary of Health and Human Services shall notify the Attorney General and the Secretary of Homeland Security not

later than 24 hours after all interim eligibility determinations have been made under clause (i).

**(iii) Duration**

Assistance under this paragraph may be provided to individuals determined to be eligible under clause (i) for a period of up to 90 days and may be extended for an additional 30 days.

**(iv) Long-term assistance for children**

**(I) Eligibility determination**

Before the expiration of the period for interim assistance under clause (iii), the Secretary of Health and Human Services shall determine if the child referred to in clause (i) is eligible for assistance under this paragraph.

**(II) Consultation**

In making a determination under subclause (I), the Secretary shall consult with the Attorney General, the Secretary of Homeland Security, and nongovernmental organizations with expertise on victims of severe form[1] of trafficking.

**(III) Letter of eligibility**

If the Secretary, after receiving information the Secretary believes, taken as a whole, indicates that the child is eligible for assistance under this paragraph, the Secretary shall issue a letter of eligibility. The Secretary may not require that the child cooperate with law enforcement as a condition for receiving such letter of eligibility.

**(H) Notification of children for interim assistance**

Not later than 24 hours after a Federal, State, or local official discovers that a person who is under 18 years of age may be a victim of a severe form of trafficking in persons, the official shall notify the Secretary of Health and Human Services to facilitate the provision of interim assistance under subparagraph (G).

**(2) Grants**

**(A) In general**

Subject to the availability of appropriations, the Attorney General may make grants to States, Indian tribes, units of local government, and nonprofit, nongovernmental victims' service organizations to develop, expand, or strengthen victim service programs for victims of human trafficking, including programs

that provide trauma-informed care or housing options to such victims who are--

**(i)(I)** between 12 and 24 years of age; and

**(II)** homeless, in foster care, or involved in the criminal justice system;

**(ii)** transitioning out of the foster care system; or

**(iii)** women or girls in underserved populations.

**(B) Allocation of grant funds**

Of amounts made available for grants under this paragraph, there shall be set aside--

**(i)** three percent for research, evaluation, and statistics;

**(ii)** 5 percent for training and technical assistance, including increasing capacity and expertise on security for and protection of service providers from intimidation or retaliation for their activities; and

**(iii)** one percent for management and administration.

**(C) Limitation on Federal share**

The Federal share of a grant made under this paragraph may not exceed 75 percent of the total costs of the projects described in the application submitted.

**(D) Priority**

In selecting recipients of grants under this paragraph that are only available for law enforcement operations or task forces, the Attorney General may give priority to any applicant that files an attestation with the Attorney General stating that--

    **(i)** the grant funds awarded under this paragraph--

        **(I)** will be used to assist in the prevention of severe forms of trafficking in persons;

        **(II)** will be used to strengthen efforts to investigate and prosecute those who knowingly benefit financially from participation in a venture that has engaged in any act of human trafficking;

        **(III)** will be used to take affirmative measures to avoid arresting, charging, or prosecuting victims of human trafficking for any offense that is the direct result of their victimization; and

        **(IV)** will not be used to require a victim of human trafficking to collaborate with law enforcement officers as a condition of access to any shelter or restorative services; and

**(ii)** the applicant will provide dedicated resources for anti-human trafficking law enforcement officers for a period that is longer than the duration of the grant received under this paragraph.

**(c) Trafficking victim regulations**

Not later than 180 days after October 28, 2000, the Attorney General, the Secretary of Homeland Security and the Secretary of State shall promulgate regulations for law enforcement personnel, immigration officials, and Department of State officials to implement the following:

**(1) Protections while in custody**

Victims of severe forms of trafficking, while in the custody of the Federal Government and to the extent practicable, shall--

**(A)** not be detained in facilities inappropriate to their status as crime victims;

**(B)** receive necessary medical care and other assistance; and

**(C)** be provided protection if a victim's safety is at risk or if there is danger of additional harm by recapture of the victim by a trafficker, including--

**(i)** taking measures to protect trafficked persons and their family members from intimidation and threats of reprisals and reprisals from traffickers and their associates; and

**(ii)** ensuring that the names and identifying information of trafficked persons and their family members are not disclosed to the public.

**(2) Access to information**

Victims of severe forms of trafficking shall have access to information about their rights and translation services. To the extent practicable, victims of severe forms of trafficking shall have access to information about federally funded or administered anti-trafficking programs that provide services to victims of severe forms of trafficking.

**(3) Authority to permit continued presence in the United States**

**(A) Trafficking victims**

**(i) In general**

If a Federal law enforcement official files an application stating that an alien is a victim of a severe form of trafficking and may be a potential witness to such trafficking, the Secretary of Homeland Security may permit the alien to remain in the United

States to facilitate the investigation and prosecution of those responsible for such crime.

**(ii) Safety**

While investigating and prosecuting suspected traffickers, Federal law enforcement officials described in clause (i) shall endeavor to make reasonable efforts to protect the safety of trafficking victims, including taking measures to protect trafficked persons and their family members from intimidation, threats of reprisals, and reprisals from traffickers and their associates.

**(iii) Continuation of presence**

The Secretary shall permit an alien described in clause (i) who has filed a civil action under section 1595 of Title 18 to remain in the United States until such action is concluded. If the Secretary, in consultation with the Attorney General, determines that the alien has failed to exercise due diligence in pursuing such action, the Secretary may revoke the order permitting the alien to remain in the United States.

**(iv) Exception**

Notwithstanding clause (iii), an alien described in such clause may be deported before the conclusion of the administrative and legal proceedings related to a complaint described in such clause if such alien is inadmissible under paragraph (2)(A)(i)(II), (2)(B), (2)(C), (2)(E), (2)(H), (2)(I), (3)(A)(i), (3)(A)(iii), (3)(B), or (3)(C) of section 1182(a) of Title 8.

**(B) Parole for relatives**

Law enforcement officials may submit written requests to the Secretary of Homeland Security, in accordance with section 1229b(b)(6) of Title 8, to permit the parole into the United States of certain relatives of an alien described in subparagraph (A)(i).

**(C) State and local law enforcement**

The Secretary of Homeland Security, in consultation with the Attorney General, shall--

**(i)** develop materials to assist State and local law enforcement officials in working with Federal law enforcement to obtain continued presence for victims of a severe form of trafficking in cases investigated or prosecuted at the State or local level; and

**(ii)** distribute the materials developed under clause (i) to State and local law enforcement officials.

**(4) Training of Government personnel**

**(A) In general**

Appropriate personnel of the Department of State, including members of the Service (as such term is defined in section 3903 of this title), the Department of Homeland Security, the Department of Health and Human Services, the Department of Labor, the Equal Employment Opportunity Commission, and the Department of Justice shall be trained in identifying victims of severe forms of trafficking and providing for the protection of such victims, including juvenile victims. The Attorney General and the Secretary of Health and Human Services, in consultation with the Secretary of Labor, shall provide training to State and local officials to improve the identification and protection of such victims.

**(B) Training components**

Training under this paragraph shall include--

**(i)** a distance learning course on trafficking-in-persons issues and the Department of State's obligations under this Act, which shall be designed for embassy reporting officers, regional bureaus' trafficking-in-persons coordinators, and their superiors;

ADD -85

**(ii)** specific trafficking-in-persons briefings for all ambassadors and deputy chiefs of mission before such individuals depart for their posts;

**(iii)** at least annual reminders to all personnel referred to in clauses (i) and (ii), including appropriate personnel from other Federal departments and agencies, at each diplomatic or consular post of the Department of State located outside the United States of--

> **(I)** key problems, threats, methods, and warning signs of trafficking in persons specific to the country or jurisdiction in which each such post is located; and

> **(II)** appropriate procedures to report information that any such personnel may acquire about possible cases of trafficking in persons; and

**(iv)** a discussion clarifying that an individual who knowingly solicits or patronizes a commercial sex act from a person who was a minor (consistent with section 1591(c) of Title 18) or was subject to force, fraud, or coercion is guilty of an offense under chapter 77 of Title 18 and is a party to a human trafficking offense.

**(d) Construction**

Nothing in subsection (c) shall be construed as creating any private cause of action against the United States or its officers or employees.

**(e) Protection from removal for certain crime victims**

**(1) to (4) Omitted**

**(5) Statutory construction**

Nothing in this section, or in the amendments made by this section, shall be construed as prohibiting the Secretary of Homeland Security from instituting removal proceedings under section 1229a of Title 8 against an alien admitted as a nonimmigrant under section 1101(a)(15)(T)(i) of Title 8, as added by subsection (e), for conduct committed after the alien's admission into the United States, or for conduct or a condition that was not disclosed to the Secretary of Homeland Security prior to the alien's admission as a nonimmigrant under such section 1101(a)(15)(T)(i) of Title 8.

**(f)**[2]**Assistance for United States citizens and lawful permanent residents**

**(1) In general**

The Secretary of Health and Human Services and the Attorney General, in consultation with the Secretary of Labor, shall establish a program to assist United States citizens and aliens lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8) who are victims of severe forms

of trafficking. In determining the assistance that would be most beneficial for such victims, the Secretary and the Attorney General shall consult with nongovernmental organizations that provide services to victims of severe forms of trafficking in the United States.

**(2) Use of existing programs**

In addition to specialized services required for victims described in paragraph (1), the program established pursuant to paragraph (1) shall--

> **(A)** facilitate communication and coordination between the providers of assistance to such victims;
>
> **(B)** provide a means to identify such providers; and
>
> **(C)** provide a means to make referrals to programs for which such victims are already eligible, including programs administered by the Department of Justice and the Department of Health and Human Services.

**(3) Grants**

> **(A) In general**
>
> The Secretary of Health and Human Services and the Attorney General may award grants to States, Indian tribes, units of local government, and nonprofit, nongovernmental victim service organizations to

develop, expand, and strengthen victim service programs authorized under this subsection.

**(B) Maximum Federal share**

The Federal share of a grant awarded under this paragraph may not exceed 75 percent of the total costs of the projects described in the application submitted by the grantee.

**(f)[2]Omitted**

**(g) Annual reports**

On or before October 31 of each year, the Secretary of Homeland Security shall submit a report to the appropriate congressional committees setting forth, with respect to the preceding fiscal year, the number, if any, of otherwise eligible applicants who did not receive visas under section 1101(a)(15)(T) of Title 8, or who were unable to adjust their status under section 1255(l) of Title 8, solely on account of the unavailability of visas due to a limitation imposed by section 1184(o)(2) or 1255(l)(4)(A) of Title 8.

## XVII.    22 U.S.C.A. § 7105a

**(a) Awarding of grants, cooperative agreements, and contracts**

In administering funds made available to carry out this Act within and outside the United States--

**(1)** solicitations of grants, cooperative agreements, and contracts for such programs shall be made publicly available;

**(2)** grants, cooperative agreements, and contracts shall be subject to full and open competition, in accordance with applicable laws; and

**(3)** the internal department or agency review process for such grants, cooperative agreements, and contracts shall not be subject to ad hoc or intermittent review or influence by individuals or organizations outside the United States Government except as provided under paragraphs (1) and (2).

## (b) Eligibility

### (1) In general

An applicant desiring a grant, contract, or cooperative agreement under this Act shall certify that, to the extent practicable, persons or entities providing legal services, social services, health services, or other assistance have completed, or will complete, training in connection with trafficking in persons.

### (2) Disclosure

If appropriate, applicants should indicate collaboration with nongovernmental organizations, including organizations with expertise in trafficking in persons.

## (c) Evaluation of anti-trafficking programs

**(1) In general**

The President shall establish a system to evaluate the effectiveness and efficiency of the assistance provided under anti-trafficking programs established under this Act on a program-by-program basis in order to maximize the long-term sustainable development impact of such assistance.

**(2) Requirements**

In carrying out paragraph (1), the President shall--

> **(A)** establish performance goals for the assistance described in paragraph (1), expressed in an objective and quantifiable form, to the extent practicable;

> **(B)** ensure that performance indicators are used for programs authorized under this Act to measure and assess the achievement of the performance goals described in subparagraph (A);

> **(C)** provide a basis for recommendations for adjustments to the assistance described in paragraph (1) to enhance the impact of such assistance; and

> **(D)** ensure that evaluations are conducted by subject matter experts in and outside the United States Government, to the extent practicable.

**(d) Targeted use of anti-trafficking programs**

In providing assistance under this chapter, the President should take into account the priorities and country assessments contained in the most recent report submitted by the Secretary of State to Congress pursuant to section 7107(b) of this title.

**(e) Consistency with other programs**

The President shall ensure that the design, monitoring, and evaluation of United States assistance programs for emergency relief, development, and poverty alleviation under part I and chapter 4 of part II of the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq. and 2346 et seq.) and other similar United States assistance programs are consistent with United States policies and other United States programs relating to combating trafficking in persons.

**(f) Authorization of appropriations**

For each of the fiscal years 2008 through 2011, not more than 5 percent of the amounts made available to carry out this chapter may be used to carry out this section, including--

**(1)** evaluations of promising anti-trafficking programs and projects funded by the disbursing agency pursuant to this Act; and

**(2)** evaluations of emerging problems or global trends.

**XVIII.    22 U.S.C.A. § 7105b**

### (a) Victim screening tools

Not later than October 1, 2018, the Attorney General shall compile and disseminate, to all grantees who are awarded grants to provide victims' services under subsection (b) or (f) of section 7105 of this title, information about reliable and effective tools for the identification of victims of human trafficking.

### (b) Use of screening procedures

Beginning not later than October 1, 2018, the Attorney General, in consultation with the Secretary of Health and Human Services, shall identify recommended practices for the screening of human trafficking victims and shall encourage the use of such practices by grantees receiving a grant to provide victim services to youth under subsection (b) or (f) of section 7105 of this title.

**XIX.    22 U.S.C.A. § 7106**

### (a) Minimum standards

For purposes of this chapter, the minimum standards for the elimination of trafficking applicable to the government of a country of origin, transit, or destination for victims of severe forms of trafficking are the following:

**(1)** The government of the country should prohibit severe forms of trafficking in persons and punish acts of such trafficking.

**(2)** For the knowing commission of any act of sex trafficking involving force, fraud, coercion, or in which the victim of sex trafficking is a child incapable of giving meaningful consent, or of trafficking which includes rape or kidnapping or which causes a death, the government of the country should prescribe punishment commensurate with that for grave crimes, such as forcible sexual assault.

**(3)** For the knowing commission of any act of a severe form of trafficking in persons, the government of the country should prescribe punishment that is sufficiently stringent to deter and that adequately reflects the heinous nature of the offense.

**(4)** The government of the country should make serious and sustained efforts to eliminate severe forms of trafficking in persons.

**(b) Criteria**

In determinations under subsection (a)(4), the following factors should be considered as indicia of serious and sustained efforts to eliminate severe forms of trafficking in persons:

**(1)** Whether the government of the country vigorously investigates and prosecutes acts of severe forms of trafficking in persons, and convicts and

sentences persons responsible for such acts, that take place wholly or partly within the territory of the country, including, as appropriate, requiring incarceration of individuals convicted of such acts. For purposes of the preceding sentence, suspended or significantly-reduced sentences for convictions of principal actors in cases of severe forms of trafficking in persons shall be considered, on a case-by-case basis, whether to be considered an indicator of serious and sustained efforts to eliminate severe forms of trafficking in persons. After reasonable requests from the Department of State for data regarding investigations, prosecutions, convictions, and sentences, a government which does not provide such data, consistent with a demonstrably increasing capacity of such government to obtain such data, shall be presumed not to have vigorously investigated, prosecuted, convicted or sentenced such acts.

**(2)** Whether the government of the country protects victims of severe forms of trafficking in persons and encourages their assistance in the investigation and prosecution of such trafficking, including provisions for legal alternatives to their removal to countries in which they would face retribution or hardship, and ensures that victims are not inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts as a direct result of being trafficked, including by providing training to law enforcement and

immigration officials regarding the identification and treatment of trafficking victims using approaches that focus on the needs of the victims.

**(3)** Whether the government of the country has adopted measures to prevent severe forms of trafficking in persons, such as measures to inform and educate the public, including potential victims, about the causes and consequences of severe forms of trafficking in persons, measures to establish the identity of local populations, including birth registration, citizenship, and nationality, measures to ensure that its nationals who are deployed abroad as part of a diplomatic, peacekeeping, or other similar mission do not engage in or facilitate severe forms of trafficking in persons or exploit victims of such trafficking, a transparent system for remediating or punishing such public officials as a deterrent, measures to prevent the use of forced labor or child labor in violation of international standards, effective bilateral, multilateral, or regional information sharing and cooperation arrangements with other countries, and effective policies or laws regulating foreign labor recruiters and holding them civilly and criminally liable for fraudulent recruiting.

**(4)** Whether the government of the country cooperates with other governments in the investigation and prosecution of severe forms of trafficking in persons and has entered into bilateral, multilateral, or regional

law enforcement cooperation and coordination arrangements with other countries.

**(5)** Whether the government of the country extradites persons charged with acts of severe forms of trafficking in persons on substantially the same terms and to substantially the same extent as persons charged with other serious crimes (or, to the extent such extradition would be inconsistent with the laws of such country or with international agreements to which the country is a party, whether the government is taking all appropriate measures to modify or replace such laws and treaties so as to permit such extradition).

**(6)** Whether the government of the country monitors immigration and emigration patterns for evidence of severe forms of trafficking in persons and whether law enforcement agencies of the country respond to any such evidence in a manner that is consistent with the vigorous investigation and prosecution of acts of such trafficking, as well as with the protection of human rights of victims and the internationally recognized human right to leave any country, including one's own, and to return to one's own country.

**(7)** Whether the government of the country vigorously investigates, prosecutes, convicts, and sentences public officials, including diplomats and soldiers, who participate in or facilitate severe forms of trafficking in persons, including nationals of the country who are deployed abroad as part of a

ADD -97

diplomatic, peacekeeping, or other similar mission who engage in or facilitate severe forms of trafficking in persons or exploit victims of such trafficking, and takes all appropriate measures against officials who condone or enable such trafficking. A government's failure to appropriately address public allegations against such public officials, especially once such officials have returned to their home countries, shall be considered inaction under these criteria. After reasonable requests from the Department of State for data regarding such investigations, prosecutions, convictions, and sentences, a government which does not provide such data, consistent with a demonstrably increasing capacity of such government to obtain such data, shall be presumed not to have vigorously investigated, prosecuted, convicted, or sentenced such acts.

**(8)** Whether the percentage of victims of severe forms of trafficking in the country that are non-citizens of such countries is insignificant.

**(9)** Whether the government has entered into effective, transparent partnerships, cooperative arrangements, or agreements that have resulted in concrete and measurable outcomes with--

> **(A)** domestic civil society organizations, private sector entities, or international nongovernmental organizations, or into multilateral or

regional arrangements or agreements, to assist the government's efforts to prevent trafficking, protect victims, and punish traffickers; or

**(B)** the United States toward agreed goals and objectives in the collective fight against trafficking.

**(10)** Whether the government of the country, consistent with the capacity of such government, systematically monitors its efforts to satisfy the criteria described in paragraphs (1) through (8) and makes available publicly a periodic assessment of such efforts.

**(11)** Whether the government of the country achieves appreciable progress in eliminating severe forms of trafficking when compared to the assessment in the previous year.

**(12)** Whether the government of the country has made serious and sustained efforts to reduce the demand for--

**(A)** commercial sex acts; and

**(B)** participation in international sex tourism by nationals of the country.

## XX.    22 U.S.C.A. § 7107

### (a) Statement of policy

It is the policy of the United States not to provide nonhumanitarian, nontrade-related foreign assistance to any government that--

**(1)** does not comply with minimum standards for the elimination of trafficking; and

**(2)** is not making significant efforts to bring itself into compliance with such standards.

**(b) Reports to Congress**

**(1) Annual report**

Not later than June 1 of each year, the Secretary of State shall submit to the appropriate congressional committees a report describing the anti-trafficking efforts of the United States and foreign governments according to the minimum standards and criteria enumerated in section 7106 of this title, and the nature and scope of trafficking in persons in each country and analysis of the trend lines for individual governmental efforts. The report shall, to the extent concurrent reporting data is available, cover efforts and activities taking place during the period between April 1 of the year preceding the report and March 31 of the year in which the report is made, and should include--

**(A)** a list of those countries, if any, to which the minimum standards for the elimination of trafficking are applicable and whose governments fully comply with such standards based only on concrete actions taken by the country that are recorded during the reporting period;

**(B)** a list of those countries, if any, to which the minimum standards for the elimination of trafficking are applicable and whose governments do not yet fully comply with such standards but are making significant efforts to bring themselves into compliance based only on concrete actions taken by the country (excluding any commitments by the country to take additional future steps during the next year) that are recorded during the reporting period;

**(C)** a list of those countries, if any, to which the minimum standards for the elimination of trafficking are applicable and whose governments do not fully comply with such standards and are not making significant efforts to bring themselves into compliance;

**(D)** information on the measures taken by the United Nations, the Organization for Security and Cooperation in Europe, the North Atlantic Treaty Organization and, as appropriate, other multilateral organizations in which the United States participates, to prevent the involvement of the organization's employees, contractor personnel, and peacekeeping forces in trafficking in persons or the exploitation of victims of trafficking;

**(E)** reporting and analysis on the emergence or shifting of global patterns in human trafficking, including data on the number of victims

trafficked to, through, or from major source and destination countries, disaggregated by nationality, gender, and age, to the extent possible;

**(F)** emerging issues in human trafficking;

**(G)** a section entitled "Promising Practices in the Eradication of Trafficking in Persons" to highlight effective practices and use of innovation and technology in prevention, protection, prosecution, and partnerships, including by foreign governments, the private sector, and domestic civil society actors; and

**(H)** for each country included in a different list than the country had been placed in the previous annual report, a detailed explanation of how the concrete actions (or lack of such actions) undertaken (or not undertaken) by the country during the previous reporting period contributed to such change, including a clear linkage between such actions and the minimum standards enumerated in section 7106 of this title.

**(2) Special watch list**

**(A) Submission of list**

Not later than the date on which the determinations described in subsections (c) and (d) are submitted to the appropriate congressional committees in accordance with such subsections, the Secretary of State

shall submit to the appropriate congressional committees a list of countries that the Secretary determines requires special scrutiny during the following year. The list shall be composed of the following countries:

**(i)** Countries that have been listed pursuant to paragraph (1)(A) in the current annual report and were listed pursuant to paragraph (1)(B) in the previous annual report.

**(ii)** Countries that have been listed pursuant to paragraph (1)(B) pursuant to the current annual report and were listed pursuant to paragraph (1)(C) in the previous annual report.

**(iii)** Countries that have been listed pursuant to paragraph (1)(B) pursuant to the current annual report, where--

**(I)** the estimated number of victims of severe forms of trafficking is very significant or is significantly increasing and the country is not taking proportional concrete actions; or

**(II)** there is a failure to provide evidence of increasing efforts to combat severe forms of trafficking in persons from the previous year, including increased investigations, prosecutions and convictions of trafficking crimes,

increased assistance to victims, and decreasing evidence of complicity in severe forms of trafficking by government officials.

**(B) Interim assessment**

Not later than February 1st of each year, the Secretary of State shall provide to the appropriate congressional committees an assessment of the progress that each country on the special watch list described in subparagraph (A) has made since April 1 of the previous year.

**(C) Relation of special watch list to annual trafficking in persons report**

A determination that a country shall not be placed on the special watch list described in subparagraph (A) shall not affect in any way the determination to be made in the following year as to whether a country is complying with the minimum standards for the elimination of trafficking or whether a country is making significant efforts to bring itself into compliance with such standards.

**(D) Countries on special watch list for 2 consecutive years**

**(i) In general**

Except as provided under clause (ii), a country that is included on the special watch list described in subparagraph (A) for 2

consecutive years after December 23, 2008, shall be included on the list of countries described in paragraph (1)(C).

**(ii) Exercise of waiver authority**

The President may waive the application of clause (i) for up to 1 year if the President determines, and reports credible evidence to the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives, that such a waiver is justified because--

> **(I)** the country has a written plan to begin making significant efforts to bring itself into compliance with the minimum standards for the elimination of trafficking;
>
> **(II)** the plan, if implemented, would constitute making such significant efforts; and
>
> **(III)** the country is devoting sufficient resources to implement the plan.

**(E) Congressional notice**

Not later than 30 days after notifying Congress of each country determined to have met the requirements under subclauses (I) through (III) of subparagraph (D)(ii), the Secretary of State shall--

**(i)** provide a detailed description of the credible information supporting such determination on a publicly available website maintained by the Department of State; and

**(ii)** offer to brief the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives on any written plan submitted by the country under subparagraph (D)(ii)(I), with an opportunity to review the written plan.

**(F) Special rule for certain countries on special watch list that are downgraded and reinstated on special watch list**

Notwithstanding subparagraphs (D) and (E), a country may not be included on the special watch list described in subparagraph (A)(iii) for more than 1 consecutive year after the country--

**(i)** was included on the special watch list described in subparagraph (A)(iii) for--

**(I)** 2 consecutive years after December 23, 2008; and

**(II)** any additional years after such date of enactment as a result of the President exercising the waiver authority under subparagraph (D)(ii); and

**(ii)** was subsequently included on the list of countries described in paragraph (1)(C).

**(3) Significant efforts**

**(A) In general**

In determinations under paragraph (1) or (2) as to whether the government of a country is making significant efforts to bring itself into compliance with the minimum standards for the elimination of trafficking, the Secretary of State shall consider--

**(i)** the extent to which the country is a country of origin, transit, or destination for severe forms of trafficking;

**(ii)** the extent of noncompliance with the minimum standards by the government and, particularly, the extent to which officials or employees of the government have participated in, facilitated, condoned, or are otherwise complicit in severe forms of trafficking;

**(iii)** what measures are reasonable to bring the government into compliance with the minimum standards in light of the resources and capabilities of the government;

**(D)**[1] the extent to which the government of the country is devoting sufficient budgetary resources--

**(i)** to investigate and prosecute acts of severe trafficking in persons;

**(ii)** to convict and sentence persons responsible for such acts; and

**(iii)** to obtain restitution for victims of human trafficking;

**(E)**[1] the extent to which the government of the country is devoting sufficient budgetary resources--

**(i)** to protect and support victims of trafficking in persons; and

**(ii)** to prevent severe forms of trafficking in persons; and

**(F)**[1] the extent to which the government of the country has consulted with domestic and international civil society organizations that resulted in concrete actions to improve the provision of services to victims of trafficking in persons.

**(B) Proof of failure to make significant efforts**

In addition to the considerations described in clauses (i), (ii), and (iii) of subparagraph (A), in determinations under paragraph (1)(C) as to

whether the government of a country is not making significant efforts to bring itself into compliance with the minimum standards for the elimination of trafficking, the Secretary of State shall consider, as proof of failure to make significant efforts, a government policy or pattern of--

    **(i)** trafficking;

    **(ii)** trafficking in government-funded programs;

    **(iii)** forced labor (in government-affiliated medical services, agriculture, forestry, mining, construction, or other sectors);

    **(iv)** sexual slavery in government camps, compounds, or outposts; or

    **(v)** employing or recruiting child soldiers.

**(4) Action plans for countries upgraded to Tier 2 watchlist**

**(A) In general**

Not later than 180 days after the release of the annual Trafficking in Persons Report, the Secretary of State, acting through the Ambassador-at-Large of the Office to Monitor and Combat Trafficking and the Assistant Secretary of the appropriate regional bureau, in consultation with appropriate officials from the government of each country

described in paragraph (2)(A)(ii), and with the assistance of the United States Ambassador or Charge d'Affaires in each country, shall--

> **(i)** prepare an action plan for each country upgraded from Tier 3 to Tier 2 Watchlist to further improve such country's tier ranking under this subsection; and

> **(ii)** present the relevant action plan to the government of each such country.

## (B) Contents

Each action plan prepared under this paragraph--

> **(i)** shall include specific concrete actions to be taken by the country to substantively address deficiencies preventing the country from meeting Tier 2 standards, based on credible information; and

> **(ii)** should be focused on short-term and multi-year goals.

## (C) Briefings

The Ambassador-at-Large of the Office to Monitor and Combat Trafficking and all appropriate regional Assistant Secretaries shall make themselves available to brief the Committee on Foreign Relations of the Senate, the Committee on Appropriations of the Senate, the Committee on Foreign Affairs of the House of Representatives, and the

Committee on Appropriations of the House of Representatives on the implementation of each action plan prepared under this paragraph.

**(D) Savings provision**

Nothing in this paragraph may be construed as modifying--

>**(i)** minimum standards for the elimination of trafficking under section 7106 of this title; or

>**(ii)** the actions against governments failing to meet minimum standards under this section or the criteria for placement on the Special Watch List under paragraph (2).

## (c) Notification

Not less than 45 days or more than 90 days after the submission, on or after January 1, 2003, of an annual report under subsection (b)(1), or an interim report under subsection (b)(2), the President shall submit to the appropriate congressional committees a notification of one of the determinations listed in subsection (d) with respect to each foreign country whose government, according to such report--

**(A)** does not comply with the minimum standards for the elimination of trafficking; and

**(B)** is not making significant efforts to bring itself into compliance, as described in subsection (b)(1)(C).

**(d) Presidential determinations**

The determinations referred to in subsection (c) are the following:

**(1) Withholding of nonhumanitarian, nontrade-related assistance**

The President has determined that--

> **(A)(i)** the United States will not provide nonhumanitarian, nontrade-related foreign assistance to the government of the country for the subsequent fiscal year until such government complies with the minimum standards or makes significant efforts to bring itself into compliance; or
>
> **(ii)** in the case of a country whose government received no nonhumanitarian, nontrade-related foreign assistance from the United States during the previous fiscal year, the United States will not provide such assistance to the government of the country for the subsequent fiscal year and will not provide funding for participation by officials or employees of such governments in educational and cultural exchange programs for the subsequent fiscal year until such government complies with the minimum standards or makes significant efforts to bring itself into compliance; and
>
> **(B)** the President will instruct the United States Executive Director of each multilateral development bank and of the International Monetary

Fund to vote against, and to use the Executive Director's best efforts to deny, any loan or other utilization of the funds of the respective institution to that country (other than for humanitarian assistance, for trade-related assistance, or for development assistance which directly addresses basic human needs, is not administered by the government of the sanctioned country, and confers no benefit to that government) for the subsequent fiscal year until such government complies with the minimum standards or makes significant efforts to bring itself into compliance.

**(2) Ongoing, multiple, broad-based restrictions on assistance in response to human rights violations**

The President has determined that such country is already subject to multiple, broad-based restrictions on assistance imposed in significant part in response to human rights abuses and such restrictions are ongoing and are comparable to the restrictions provided in paragraph (1). Such determination shall be accompanied by a description of the specific restriction or restrictions that were the basis for making such determination.

**(3) Subsequent compliance**

The Secretary of State has determined that the government of the country has come into compliance with the minimum standards or is making significant efforts to bring itself into compliance.

**(4) Continuation of assistance in the National interest**

Notwithstanding the failure of the government of the country to comply with minimum standards for the elimination of trafficking and to make significant efforts to bring itself into compliance, the President has determined that the provision to the country of nonhumanitarian, nontrade-related foreign assistance or funding for participation in educational and cultural exchange programs, or the multilateral assistance described in paragraph (1)(B), or both, would promote the purposes of this chapter or is otherwise in the national interest of the United States.

**(5) Exercise of waiver authority**

    **(A) In general**

The President may exercise the authority under paragraph (4) with respect to--

        **(i)** all nonhumanitarian, nontrade-related foreign assistance or funding for participation in educational and cultural exchange programs to a country;

**(ii)** all multilateral assistance described in paragraph (1)(B) to a country; or

**(iii)** one or more programs, projects, or activities of such assistance.

**(B) Avoidance of significant adverse effects**

The President shall exercise the authority under paragraph (4) when necessary to avoid significant adverse effects on vulnerable populations, including women and children.

**(6) Definition of multilateral development bank**

In this subsection, the term "multilateral development bank" refers to any of the following institutions: the International Bank for Reconstruction and Development, the International Development Association, the International Finance Corporation, the Inter-American Development Bank, the Asian Development Bank, the Inter-American Investment Corporation, the African Development Bank, the African Development Fund, the European Bank for Reconstruction and Development, and the Multilateral Investment Guaranty Agency.

**(e) Certification**

Together with any notification under subsection (c), the President shall provide a certification by the Secretary of State that, with respect to any assistance

described in clause (ii), (iii), or (v) of section 7102(8)(A) of this title, or with respect to any assistance described in section 7102(8)(B) of this title, no assistance is intended to be received or used by any agency or official who has participated in, facilitated, or condoned a severe form of trafficking in persons.

## XXI.  22 U.S.C.A. § 7108

(a) **Authority to sanction significant traffickers in persons**

(1) **In general**

The President may exercise the authorities set forth in section 1702 of Title 50 without regard to section 1701 of Title 50, or section 1263 of the Global Magnitsky Human Rights Accountability Act (subtitle F of title XII of Public Law 114-328; 22 U.S.C. 2656 note), in the case of any of the following persons:

(A) Any foreign person that plays a significant role in a severe form of trafficking in persons, directly or indirectly in the United States.

(B) Foreign persons that materially assist in, or provide financial or technological support for or to, or provide goods or services in support of, activities of a significant foreign trafficker in persons identified pursuant to subparagraph (A).

(C) Foreign persons that are owned, controlled, or directed by, or acting for or on behalf of, a significant foreign trafficker identified pursuant to subparagraph (A).

(D) Officials of a foreign government who participate in, facilitate, or condone severe forms of trafficking in persons for significant financial gain.

(2) **Penalties**

The penalties set forth in section 1705 of Title 50 apply to violations of any license, order, or regulation issued under this section.

(b) **Report to Congress on identification and sanctioning of significant traffickers in persons**

(1) **In general**

Upon exercising the authority of subsection (a), the President shall report to the appropriate congressional committees--

(A) identifying publicly the foreign persons that the President determines are appropriate for sanctions pursuant to this section and the basis for such determination; and

(B) detailing publicly the sanctions imposed pursuant to this section.

(2) **Removal of sanctions**

Upon suspending or terminating any action imposed under the authority of subsection (a), the President shall report to the committees described in paragraph (1) on such suspension or termination.

### (3) Submission of classified information

Reports submitted under this subsection may include an annex with classified information regarding the basis for the determination made by the President under paragraph (1)(A).

## (c) Law enforcement and intelligence activities not affected

Nothing in this section prohibits or otherwise limits the authorized law enforcement or intelligence activities of the United States, or the law enforcement activities of any State or subdivision thereof.

## (d) Omitted

## (e) Implementation

### (1) Delegation of authority

The President may delegate any authority granted by this section, including the authority to designate foreign persons under paragraphs (1)(B) and (1)(C) of subsection (a).

### (2) Promulgation of rules and regulations

The head of any agency, including the Secretary of Treasury, is authorized to take such actions as may be necessary to carry out any authority delegated by

the President pursuant to paragraph (1), including promulgating rules and regulations.

(3) **Opportunity for review**

Such rules and regulations shall include procedures affording an opportunity for a person to be heard in an expeditious manner, either in person or through a representative, for the purpose of seeking changes to or termination of any determination, order, designation or other action associated with the exercise of the authority in subsection (a).

(f) **Definition of foreign persons**

In this section, the term "foreign person" means any citizen or national of a foreign state or any entity not organized under the laws of the United States, including a foreign government official, but does not include a foreign state.

(g) **Construction**

Nothing in this section shall be construed as precluding judicial review of the exercise of the authority described in subsection (a).

**XXII.    22 U.S.C.A. § 7109**

(a) **Omitted**

(b) **Amendment to the Sentencing Guidelines**

(1) Pursuant to its authority under section 994 of Title 28 and in accordance with this section, the United States Sentencing Commission shall review and,

if appropriate, amend the sentencing guidelines and policy statements applicable to persons convicted of offenses involving the trafficking of persons including component or related crimes of peonage, involuntary servitude, slave trade offenses, and possession, transfer or sale of false immigration documents in furtherance of trafficking, and the Fair Labor Standards Act and the Migrant and Seasonal Agricultural Worker Protection Act.

(2) In carrying out this subsection, the Sentencing Commission shall--

(A) take all appropriate measures to ensure that these sentencing guidelines and policy statements applicable to the offenses described in paragraph (1) of this subsection are sufficiently stringent to deter and adequately reflect the heinous nature of such offenses;

(B) consider conforming the sentencing guidelines applicable to offenses involving trafficking in persons to the guidelines applicable to peonage, involuntary servitude, and slave trade offenses; and

(C) consider providing sentencing enhancements for those convicted of the offenses described in paragraph (1) of this subsection that--

(i) involve a large number of victims;

(ii) involve a pattern of continued and flagrant violations;

(iii) involve the use or threatened use of a dangerous weapon; or

(iv) result in the death or bodily injury of any person.

(3) The Commission may promulgate the guidelines or amendments under this subsection in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that Act had not expired.

## XXIII.    22 U.S.C.A. § 7109a

### (a) In general

The President, acting through the Council of Economic Advisors, the National Research Council of the National Academies, the Secretary of Labor, the Secretary of Health and Human Services, the Attorney General, the Secretary of State, the Administrator of the United States Agency for International Development, and the Director of National Intelligence, shall carry out research, including by providing grants to nongovernmental organizations, as well as relevant United States Government agencies and international organizations, which furthers the purposes of this chapter and provides data to address the problems identified in the findings of this chapter. Such research initiatives shall, to the maximum extent practicable, include, but not be limited to, the following:

**(1)** The economic causes and consequences of trafficking in persons.

**(2)** The effectiveness of programs and initiatives funded or administered by Federal agencies to prevent trafficking in persons and to protect and assist victims of trafficking.

**(3)** The interrelationship between trafficking in persons and global health risks, particularly HIV/AIDS.

**(4)** Subject to subsection (b), the interrelationship between trafficking in persons and terrorism, including the use of profits from trafficking in persons to finance terrorism.

**(5)** An effective mechanism for quantifying the number of victims of trafficking on a national, regional, and international basis, which shall include, not later than 2 years after December 23, 2008, the establishment and maintenance of an integrated database within the Human Smuggling and Trafficking Center.

**(6)** The abduction and enslavement of children for use as soldiers, including steps taken to eliminate the abduction and enslavement of children for use as soldiers and recommendations for such further steps as may be necessary to rapidly end the abduction and enslavement of children for use as soldiers.

**(b) Role of Human Smuggling and Trafficking Center**

**(1) In general**

The research initiatives described in paragraphs (4) and (5) of subsection (a) shall be carried out by the Human Smuggling and Trafficking Center, established under section 1777 of Title 8.

**(2) Database**

The database described in subsection (a)(5) shall be established by combining all applicable data collected by each Federal department and agency represented on the Interagency Task Force to Monitor and Combat Trafficking, consistent with the protection of sources and methods, and, to the maximum extent practicable, applicable data from relevant international organizations, to--

> **(A)** improve the coordination of the collection of data related to trafficking in persons by each agency of the United States Government that collects such data;

> **(B)** promote uniformity of such data collection and standards and systems related to such collection;

> **(C)** undertake a meta-analysis of patterns of trafficking in persons, slavery, and slave-like conditions to develop and analyze global trends in human trafficking;

**(D)** identify emerging issues in human trafficking and establishing integrated methods to combat them; and

**(E)** identify research priorities to respond to global patterns and emerging issues.

### (3) Consultation

The database established in accordance with paragraph (2) shall be maintained in consultation with the Director of the Office to Monitor and Combat Trafficking in Persons of the Department of State.

### (4) Authorization of appropriations

There are authorized to be appropriated $1,000,000 to the Human Smuggling and Trafficking Center for each of the fiscal years 2018 through 2021 to carry out the activities described in this subsection.

## (c) Definitions

In this section:

### (1) AIDS

The term "AIDS" means the acquired immune deficiency syndrome.

### (2) HIV

The term "HIV" means the human immunodeficiency virus, the pathogen that causes AIDS.

### (3) HIV/AIDS

The term "HIV/AIDS" means, with respect to an individual, an individual who is infected with HIV or living with AIDS.

## XXIV.    22 U.S.C.A. § 7109b

### (a) Establishment of award

The President is authorized to establish an award, to be known as the "Presidential Award for Extraordinary Efforts To Combat Trafficking in Persons", for extraordinary efforts to combat trafficking in persons. To the maximum extent practicable, the Secretary of State shall present the award annually to not more than 5 individuals or organizations, including--

**(1)** individuals who are United States citizens or foreign nationals; and

**(2)** United States or foreign nongovernmental organizations.

### (b) Selection

The President shall establish procedures for selecting recipients of the award authorized under subsection (a).

### (c) Ceremony

The Secretary of State shall host an annual ceremony for recipients of the award authorized under subsection (a) as soon as practicable after the date on which the Secretary submits to Congress the report required under section 7107(b)(1) of this title. The Secretary of State may pay the travel costs of each recipient and a guest of each recipient who attends the ceremony.

**(d) Authorization of appropriations**

There are authorized to be appropriated, for each of the fiscal years 2008 through 2011, such sums as may be necessary to carry out this section.

## XXV.   22 U.S.C.A. § 7110

### (a) Authorization of appropriations in support of the Task Force

There are authorized to be appropriated to the Department of State, for each of the fiscal years 2018 through 2021, $13,822,000 for Diplomatic and Consular Programs of the Office to Monitor and Combat Trafficking in Persons, which shall be used to carry out sections 7103(e), 7103(f)[1], and 7107 of this title, including for additional personnel.

### (b) Authorization of appropriations to the Secretary of Health and Human Services

#### (1) Eligibility for benefits and assistance

To carry out the purposes of sections 7104(b) and 7105(b) of this title, there are authorized to be appropriated to the Secretary of Health and Human Services $19,500,000 for each of the fiscal years 2018 through 2021, of which $3,500,000 is authorized to be appropriated for each fiscal year for the National Human Trafficking Hotline.

#### (2) Additional benefits for trafficking victims

To carry out the purposes of section 7105(f)[1] of this title, there are authorized to be appropriated $8,000,000 to the Secretary of Health and Human Services for each of the fiscal years 2018 through 2021.

**(c) Authorization of appropriations to the Secretary of State**

**(1) Assistance to combat trafficking**

There are authorized to be appropriated to the Department of State, for each of the fiscal years 2018 through 2021, $65,000,000, which shall be used--

**(A)** to carry out sections 7104 and 7105(a) of this title;

**(B)** to carry out section 2152d of this title;

**(C)** to assist countries in meeting the minimum standards described in section 7106 of this title; and

**(D)** for programs and activities on prevention, protection, and prosecution to combat all forms of trafficking in persons internationally, including training activities for law enforcement officers, prosecutors, and members of the judiciary with respect to trafficking in persons at the International Law Enforcement Academies.

**(2) Preparation of annual country reports on human rights**

To carry out the purposes of sections 2151n(f) and 2304(h) of this title, there are authorized to be appropriated to the Secretary of State such sums as may

be necessary to include the additional information required by that section in the annual Country Reports on Human Rights Practices.

## (d) Authorization of appropriations to Attorney General

### (1) Eligibility for benefits and assistance

To carry out the purposes of section 7105(b) of this title, there are authorized to be appropriated to the Attorney General $77,000,000 for each of fiscal years 2018 through 2021.

### (2) Assistance to foreign countries

To carry out the purposes of section 2152d of this title, there are authorized to be appropriated to the President, acting through the Attorney General and the Secretary of State, $250,000 for each of fiscal years 2008 through 2011 to carry out training activities for law enforcement officers, prosecutors, and members of the judiciary with respect to trafficking in persons at the International Law Enforcement Academies.

### (3) Additional benefits for trafficking victims

To carry out the purposes of section 7105(f)[1] of this title, there are authorized to be appropriated $11,000,000 to the Attorney General for each of the fiscal years 2018 through 2021.

## (e) Authorization of appropriations to President

### (1) Foreign victim assistance

To carry out the purposes of section 7104 of this title, there are authorized to be appropriated to the President $7,500,000 for each of the fiscal years 2014 through 2017.

### (2) Assistance to foreign countries to meet minimum standards

To carry out the purposes of section 2152d of this title, there are authorized to be appropriated to the President $7,500,000 for each of the fiscal years 2014 through 2017.

### (3) Research

To carry out the purposes of section 7109a of this title, there are authorized to be appropriated to the President $2,000,000 for each of the fiscal years 2008 through 2011.

## (f) Authorization of appropriations to the Secretary of Labor

To carry out the purposes of section 7105(b) of this title, there are authorized to be appropriated to the Secretary of Labor $5,000,000 for each of the fiscal years 2018 through 2021..[2]

## (g) Limitation on use of funds

### (1) Restriction on programs

No funds made available to carry out this chapter, or any amendment made by this chapter, may be used to promote, support, or advocate the legalization or practice of prostitution. Nothing in the preceding sentence shall be

construed to preclude assistance designed to promote the purposes of this Act by ameliorating the suffering of, or health risks to, victims while they are being trafficked or after they are out of the situation that resulted from such victims being trafficked.

**(2) Restriction on organizations**

No funds made available to carry out this chapter, or any amendment made by this chapter, may be used to implement any program that targets victims of severe forms of trafficking in persons described in section 7102(9)(A) of this title through any organization that has not stated in either a grant application, a grant agreement, or both, that it does not promote, support, or advocate the legalization or practice of prostitution. The preceding sentence shall not apply to organizations that provide services to individuals solely after they are no longer engaged in activities that resulted from such victims being trafficked.

**(h) Authorization of appropriations to Director of the FBI**

There are authorized to be appropriated to the Director of the Federal Bureau of Investigation $15,000,000 for each of the fiscal years 2008 through 2011, to remain available until expended, to investigate severe forms of trafficking in persons.

**(i) Authorization of appropriations to the Secretary of Homeland Security**

There are authorized to be appropriated to the Secretary of Homeland Security,[3] $10,000,000 for each of the fiscal years 2018 through 2021, to remain available until expended, for investigations by the Bureau of Immigration and Customs Enforcement of severe forms of trafficking in persons.

## XXVI.    22 U.S.C.A. § 7111

At least 15 days prior to voting for a new or reauthorized peacekeeping mission under the auspices of the United Nations, the North Atlantic Treaty Organization, or any other multilateral organization in which the United States participates (or in an emergency, as far in advance as is practicable), the Secretary of State shall submit to the Committee on Foreign Affairs of the House of Representatives, the Committee on Foreign Relations of the Senate, and any other appropriate congressional committee a report that contains--

(A) a description of measures taken by the organization to prevent the organization's employees, contractor personnel, and peacekeeping forces serving in the peacekeeping mission from trafficking in persons, exploiting victims of trafficking, or committing acts of sexual exploitation or abuse, and the measures in place to hold accountable any such individuals who engage in any such acts while participating in the peacekeeping mission; and

**(B)** an analysis of the effectiveness of each of the measures referred to in subparagraph (A).

## XXVII.    22 U.S.C.A. § 7112

### (a) Activities of the Department of State

#### (1) Finding

Congress finds that in the report submitted to Congress by the Secretary of State in June 2005 pursuant to section 7107(b) of this title, the list of countries whose governments do not comply with the minimum standards for the elimination of trafficking and are not making significant efforts to bring themselves into compliance was composed of a large number of countries in which the trafficking involved forced labor, including the trafficking of women into domestic servitude.

#### (2) Sense of Congress

It is the sense of Congress that the Director of the Office to Monitor and Combat Trafficking of the Department of State should intensify the focus of the Office on forced labor in the countries described in paragraph (1) and other countries in which forced labor continues to be a serious human rights concern.

#### (3) Information sharing

The Secretary of State shall, on a regular basis, provide information relating to child labor and forced labor in the production of goods in violation of international standards to the Department of Labor to be used in developing the list described in subsection (b)(2)(C).

**(b) Activities of the Department of Labor**

**(1) In general**

The Secretary of Labor, acting through the head of the Bureau of International Labor Affairs of the Department of Labor, shall carry out additional activities to monitor and combat forced labor and child labor in foreign countries as described in paragraph (2).

**(2) Additional activities described**

The additional activities referred to in paragraph (1) are--

**(A)** to monitor the use of forced labor and child labor in violation of international standards;

**(B)** to provide information regarding trafficking in persons for the purpose of forced labor to the Office to Monitor and Combat Trafficking of the Department of State for inclusion in trafficking in persons report required by section 7107(b) of this title;

**(C)** to develop and make available to the public a list of goods from countries that the Bureau of International Labor Affairs has reason to

believe are produced by forced labor or child labor in violation of international standards, including, to the extent practicable, goods that are produced with inputs that are produced with forced labor or child labor;

**(D)** to work with persons who are involved in the production of goods on the list described in subparagraph (C) to create a standard set of practices that will reduce the likelihood that such persons will produce goods using the labor described in such subparagraph; and

**(E)** to consult with other departments and agencies of the United States Government to reduce forced and child labor internationally and ensure that products made by forced labor and child labor in violation of international standards are not imported into the United States.

**(3) Submission to Congress**

Not later than December 1, 2014, and every 2 years thereafter, the Secretary of Labor shall submit the list developed under paragraph (2)(C) to Congress.

**XXVIII.    22 U.S.C.A. § 7113**

**(a) In general**

For fiscal year 2013, and each fiscal year thereafter, all grants awarded by the Attorney General under this title or an Act amended by this title shall be subject to the following accountability provisions:

**(1) Audit requirement**

**(A) Definition**

In this paragraph, the term "unresolved audit finding" means an audit report finding in the final audit report of the Inspector General of the Department of Justice that the grantee has used grant funds for an unauthorized expenditure or otherwise unallowable cost that is not closed or resolved during the 12-month period beginning on the date on which the final audit report is issued[1]

**(B) Requirement**

Beginning in the first fiscal year beginning after March 7, 2013, and in each fiscal year thereafter, the Inspector General of the Department of Justice shall conduct audits of recipients of grants under this title or an Act amended by this title to prevent waste, fraud, and abuse of funds by grantees. The Inspector General shall determine the appropriate number of grantees to be audited each year.

**(C) Mandatory exclusion**

A recipient of grant funds under this title or an Act amended by this title that is found to have an unresolved audit finding shall not be eligible to receive grant funds under this title or an Act amended by this

title during the first 2 fiscal years beginning after the end of the 12-month period described in subparagraph (A).

**(D) Priority**

In awarding grants under this title or an Act amended by this title, the Attorney General shall give priority to eligible applicants that did not have an unresolved audit finding during the 3 fiscal years before submitting an application for a grant under this title or an Act amended by this title.

**(E) Reimbursement**

If an entity is awarded grant funds under this title or an Act amended by this title during the 2-fiscal-year period during which the entity is barred from receiving grants under subparagraph (C), the Attorney General shall--

> **(i)** deposit an amount equal to the amount of the grant funds that were improperly awarded to the grantee into the General Fund of the Treasury; and

> **(ii)** seek to recoup the costs of the repayment to the fund from the grant recipient that was erroneously awarded grant funds.

**(2) Nonprofit organization requirements**

> **(A) Definition**

For purposes of this paragraph and the grant programs under this title or an Act amended by this title, the term "nonprofit organization" means an organization that is described in section 501(c)(3) of Title 26 and is exempt from taxation under section 501(a) of such title.

**(B) Prohibition**

The Attorney General may not award a grant under this title or an Act amended by this title to a nonprofit organization that holds money in offshore accounts for the purpose of avoiding paying the tax described in section 511(a) of Title 26.

**(C) Disclosure**

Each nonprofit organization that is awarded a grant under this title or an Act amended by this title and uses the procedures prescribed in regulations to create a rebuttable presumption of reasonableness for the compensation of its officers, directors, trustees and key employees, shall disclose to the Attorney General, in the application for the grant, the process for determining such compensation, including the independent persons involved in reviewing and approving such compensation, the comparability data used, and contemporaneous substantiation of the deliberation and decision. Upon request, the

Attorney General shall make the information disclosed under this subparagraph available for public inspection.

**(3) Conference expenditures**

**(A) Limitation**

No amounts authorized to be appropriated to the Department of Justice under this title or an Act amended by this title may be used by the Attorney General, or by any individual or entity awarded discretionary funds through a cooperative agreement under this title or an Act amended by this title, to host or support any expenditure for conferences that uses more than $20,000 in funds made available to the Department of Justice, unless the Deputy Attorney General or the appropriate Assistant Attorney General, Director, or principal deputy (as designated by the Deputy Attorney General) provides prior written authorization that the funds may be expended to host the conference.

**(B) Written approval**

Written approval under subparagraph (A) shall include a written estimate of all costs associated with the conference, including the cost of all food, beverages, audio-visual equipment, honoraria for speakers, and entertainment.

**(C) Report**

The Deputy Attorney General shall submit an annual report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives on all conference expenditures approved under this paragraph.

**(4) Annual certification**

Beginning in the first fiscal year beginning after March 7, 2013, the Attorney General shall submit, to the Committee on the Judiciary and the Committee on Appropriations of the Senate and the Committee on the Judiciary and the Committee on Appropriations of the House of Representatives, an annual certification indicating whether--

**(A)** all audits issued by the Office of the Inspector General under paragraph (1) have been completed and reviewed by the appropriate Assistant Attorney General or Director;

**(B)** all mandatory exclusions required under paragraph (1)(C) have been issued;

**(C)** all reimbursements required under paragraph (1)(E) have been made; and

**(D)** includes a list of any grant recipients excluded under paragraph (1) from the previous year.

**(b) Application to additional grants**

For purposes of subsection (a), for fiscal year 2018, and each fiscal year thereafter, the term "grant awarded by the Attorney General under this title or an Act amended by this title" includes a grant under any of the following:

**(1)** Section 20333 of Title 34.

**(2)** The program under section 20709c of Title 34.

## XXIX.    22 U.S.C.A. § 7114

### (a) Actions by the Secretary of Defense

#### (1) In general

Not later than 90 days after December 23, 2016, the Secretary of Defense shall provide to the appropriate congressional committees a briefing on the policies and guidance of the Department of Defense with respect to the education and training on human slavery and the appropriate role of the United States Armed Forces in combatting trafficking in persons that is received by personnel of the Armed Forces, including uniformed personnel and civilians engaged in partnership with foreign nations.

#### (2) Elements

The briefing required under paragraph (1) shall address--

**(A)** resources available for Armed Forces personnel who become aware of instances of human slavery or trafficking in persons while deployed overseas; and

**(B)** guidance on the requirement to make official reports through the chain of command, the roles and responsibilities of military and civilian officials of the United States Armed Forces and host nations, circumstances in which members of the Armed Forces are authorized to take immediate action to prevent loss of life or serious injury, and the authority to use appropriate force to stop or prevent sexual abuse or exploitation of children.

**(b) Grant authorization**

The Secretary of State is authorized to make a grant or grants of funding to provide support for transformational programs and projects that seek to achieve a measurable and substantial reduction of the prevalence of modern slavery in targeted populations within partner countries (or jurisdictions thereof).

**(c) Monitoring and evaluation**

Any grantee shall--

**(1)** develop specific and detailed criteria for the monitoring and evaluation of supported projects;

**(2)** implement a system for measuring progress against baseline data that is rigorously designed based on international corporate and nongovernmental best practices;

**(3)** ensure that each supported project is regularly and rigorously monitored and evaluated, on a not less than biennial basis, by an independent monitoring and evaluation entity, against the specific and detailed criteria established pursuant to paragraph (1), and that the progress of the project towards its stated goals is measured by such entity against baseline data;

**(4)** support the development of a scientifically sound, representative survey methodology for measuring prevalence with reference to existing research and experience, and apply the methodology consistently to determine the baseline prevalence in target populations and outcomes in order to periodically assess progress in reducing prevalence; and

**(5)** establish, and revise on a not less than annual basis, specific and detailed criteria for the suspension and termination, as appropriate, of projects supported by the grantee that regularly or consistently fail to meet the criteria required by this section.

## (d) Auditing

### (1) In general

Any grantee shall be subject to the same auditing, recordkeeping, and reporting obligations required under subsections (e), (f), (g), and (i) of section 4413 of this title.

### (2) Comptroller General audit authority

**(A) In general**

The Comptroller General of the United States may evaluate the financial transactions of the grantee as well as the programs or activities the grantee carries out pursuant to this section.

**(B) Access to records**

Any grantee shall provide the Comptroller General, or the Comptroller General's duly authorized representatives, access to such records as the Comptroller General determines necessary to conduct evaluations authorized by this section.

**(e) Annual report**

Any grant recipient shall submit a report to the Secretary of State annually and the Secretary shall transmit it to the appropriate congressional committees within 30 days. Such report shall include the names of each of the projects or sub-grantees receiving such funding pursuant to this section and the amount of funding provided for, along with a detailed description of, each such project.

**(f) Rule of construction regarding availability of fiscal year 2016 appropriations**

The enactment of this section is deemed to meet the condition of the first proviso of paragraph (2) of section 7060(f) of the Department of State, Foreign Operations, and Related Appropriations[1] Act, 2016 (division K of Public Law 114-

113), and the funds referred to in such paragraph shall be made available in accordance with, and for the purposes set forth in, such paragraph.

**(g) Authorization of appropriations; sunset**

**(1) Authorization of appropriations for fiscal years 2017 through 2020**

There is authorized to be appropriated to the Department of State for the purpose of making a grant or grants authorized under this section, for each fiscal year from 2017 through 2020, $37,500,000.

**(2) Sunset**

The authorities of subsections (b) through (f) shall expire on September 30, 2020.

**(h) Comptroller General review of existing programs**

**(1) In general**

Not later than September 30, 2018, and September 30, 2020, the Comptroller General of the United States shall submit to Congress a report on all of the programs conducted by the Department of State, the United States Agency for International Development, the Department of Labor, the Department of Defense, and the Department of the Treasury that address human trafficking and modern slavery, including a detailed analysis of the effectiveness of such programs in limiting human trafficking and modern slavery and specific recommendations on which programs are not effective at reducing the

prevalence of human trafficking and modern slavery and how the funding for such programs may be redirected to more effective efforts.

**(2) Consideration of report**

The Comptroller General of the United States shall brief the appropriate congressional committees on the report submitted under paragraph (1). The appropriate congressional committees shall review and consider the reports and shall, as appropriate, consider modifications to authorization levels and programs within the jurisdiction of such committees to address the recommendations made in the report.

### (i) Appropriate congressional committees defined

In this section, the term "appropriate congressional committees" means--

> **(1)** the Committee on Foreign Relations, the Committee on Armed Services, and the Committee on Appropriations of the Senate; and
>
> **(2)** the Committee on Foreign Affairs, the Committee on Armed Services, and the Committee on Appropriations of the House of Representatives.

XXX.    **28 U.S.C.A. § 1331**

The district courts shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States.

XXXI.    **28 U.S.C.A. § 1343 (Excerpt)**

**(a)** The district courts shall have original jurisdiction of any civil action authorized

by law to be commenced by any person:

   **(3)** To redress the deprivation, under color of any State law, statute,

   ordinance, regulation, custom or usage, of any right, privilege or immunity

   secured by the Constitution of the United States or by any Act of Congress

   providing for equal rights of citizens or of all persons within the jurisdiction

   of the United States;

XXXII.    **42 U.S.C.A. § 1983**

Every person who, under color of any statute, ordinance, regulation, custom,

or usage, of any State or Territory or the District of Columbia, subjects, or

causes to be subjected, any citizen of the United States or other person within

the jurisdiction thereof to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for

redress, except that in any action brought against a judicial officer for an act

or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## XXXIII. N.R.S. 201.354

1. It is unlawful for any person to engage in prostitution or solicitation therefor, except in a licensed house of prostitution.

2. Any person who violates subsection 1 by soliciting for prostitution:

(a) A peace officer who is posing as a child; or

(b) A person who is assisting a peace officer by posing as a child,

is guilty of soliciting a child for prostitution.

3. A prostitute who violates subsection 1 is guilty of a misdemeanor. A peace officer who:

(a) Detains, but does not arrest or issue a citation to a prostitute for a violation of subsection 1 shall, before releasing the prostitute, provide information regarding and opportunities for connecting with social service agencies that may provide assistance to the prostitute. The Department of Health and Human Services shall assist law enforcement agencies in providing

information regarding and opportunities for connecting with such social service agencies pursuant to this paragraph.

(b) Arrests or issues a citation to a prostitute for a violation of subsection 1 shall, before the prostitute is released from custody or cited:

    (1) Inform the prostitute that he or she may be eligible for assignment to a preprosecution diversion program established pursuant to NRS 174.032; and

    (2) Provide the information regarding and opportunities for connecting with social service agencies described in paragraph (a).

4. Except as otherwise provided in subsection 6, a customer who violates this section:

(a) For a first offense, is guilty of a misdemeanor and shall be punished as provided in NRS 193.150, and by a fine of not less than $400.

(b) For a second offense, is guilty of a gross misdemeanor and shall be punished as provided in NRS 193.140, and by a fine of not less than $800.

(c) For a third or subsequent offense, is guilty of a gross misdemeanor and shall be punished as provided in NRS 193.140, and by a fine of not less than $1,300.

5. In addition to any other penalty imposed, the court shall order a person who violates subsection 4 to pay a civil penalty of not less than $200 per offense. The

civil penalty must be paid to the district attorney or city attorney of the jurisdiction in which the violation occurred. If the civil penalty imposed pursuant to this subsection:

(a) Is not within the person's present ability to pay, in lieu of paying the penalty, the court may allow the person to perform community service for a reasonable number of hours, the value of which would be commensurate with the civil penalty.

(b) Is not entirely within the person's present ability to pay, in lieu of paying the entire civil penalty, the court may allow the person to perform community service for a reasonable number of hours, the value of which would be commensurate with the amount of the reduction of the civil penalty.

6. A customer who violates this section by soliciting a child for prostitution:

(a) For a first offense, is guilty of a category D felony and shall be punished as provided in NRS 193.130, and by a fine of not more than $5,000.

(b) For a second offense, is guilty of a category C felony and shall be punished as provided in NRS 193.130.

(c) For a third or subsequent offense, is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 1 year and a maximum term of not more than 6 years, and may be further punished by a fine of not more than $15,000. The court shall not grant

probation to or suspend the sentence of a person punished pursuant to this paragraph.

7. Any civil penalty collected by a district attorney or city attorney pursuant to subsection 5 must be deposited in the county or city treasury, as applicable, to be used for:

    (a) The enforcement of this section; and

    (b) Programs of treatment for persons who solicit prostitution which are certified by the Division of Public and Behavioral Health of the Department of Health and Human Services.

Not less than 50 percent of the money deposited in the county or city treasury, as applicable, pursuant to this subsection must be used for the enforcement of this section.

8. If a person who violates subsection 1 is ordered pursuant to NRS 4.373 or 5.055 to participate in a program for the treatment of persons who solicit prostitution, upon fulfillment of the terms and conditions of the program, the court may discharge the person and dismiss the proceedings against the person. If the court discharges the person and dismisses the proceedings against the person, a nonpublic record of the discharge and dismissal must be transmitted to and retained by the Division of Parole and Probation of the Department of Public Safety solely for the use of the courts in determining whether, in later proceedings, the person qualifies under this section for

participation in a program of treatment for persons who solicit prostitution. Except as otherwise provided in this subsection, discharge and dismissal under this subsection is without adjudication of guilt and is not a conviction for purposes of employment, civil rights or any statute or regulation or license or questionnaire or for any other public or private purpose, but is a conviction for the purpose of additional penalties imposed for a second or subsequent conviction or the setting of bail. Discharge and dismissal restores the person discharged, in the contemplation of the law, to the status occupied before the proceedings. The person may not be held thereafter under any law to be guilty of perjury or otherwise giving a false statement by reason of failure to recite or acknowledge the proceedings in response to an inquiry made of the person for any purpose. Discharge and dismissal under this subsection may occur only once with respect to any person. A professional licensing board may consider a proceeding under this subsection in determining suitability for a license or liability to discipline for misconduct. Such a board is entitled for those purposes to a truthful answer from the applicant or licensee concerning any such proceeding with respect to the applicant or licensee.

9. Except as limited by subsection 10, if a person is discharged and the proceedings against the person are dismissed pursuant to subsection 8, the court shall, without a hearing, order sealed all documents, papers and exhibits in that person's record, minute book entries and entries on dockets, and other documents relating to the case

in the custody of such other agencies and officers as are named in the court's order. The court shall cause a copy of the order to be sent to each agency or officer named in the order. Each such agency or officer shall notify the court in writing of its compliance with the order.

10. A professional licensing board is entitled, for the purpose of determining suitability for a license or liability to discipline for misconduct, to inspect and to copy from a record sealed pursuant to this section.

11. If, at any time before the trial of a prostitute charged with a violation of subsection 1, the prosecuting attorney has reason to believe that the prostitute is a victim of sex trafficking, the prosecuting attorney shall dismiss the charge. As used in this subsection, "sex trafficking" means a violation of subsection 2 of NRS 201.300.

## XXXIV.    N.R.S. 244.345

1. Every natural person wishing to be employed as an entertainer for an entertainment by referral service and every natural person, firm, association of persons or corporation wishing to engage in the business of conducting a dancing hall, escort service, entertainment by referral service or gambling game or device permitted by law, outside of an incorporated city, must:

(a) Make application to the license board of the county in which the employment or business is to be engaged in, for a county license of the kind

desired. The application must be in a form prescribed by the regulations of the license board.

(b) File the application with the required license fee with the county license collector, as provided in chapter 364 of NRS, who shall present the application to the license board at its next regular meeting.

The board, in counties whose population is less than 700,000, may refer the petition to the sheriff, who shall report upon it at the following regular meeting of the board. In counties whose population is 700,000 or more, the board shall refer the petition to the metropolitan police department. The department shall conduct an investigation relating to the petition and report its findings to the board at the next regular meeting of the board. The board shall at that meeting grant or refuse the license prayed for or enter any other order consistent with its regulations. Except in the case of an application for a license to conduct a gambling game or device, the county license collector may grant a temporary permit to an applicant, valid only until the next regular meeting of the board. In unincorporated towns and cities governed pursuant to the provisions of chapter 269 of NRS, the license board has the exclusive power to license and regulate the employment and businesses mentioned in this subsection.

ADD - 153

2. The board of county commissioners, and in a county whose population is less than 700,000, the sheriff of that county constitute the license board, and the county clerk or other person designated by the license board is the clerk thereof, in the respective counties of this state.

3. The license board may, without further compensation to the board or its clerk:

(a) Fix, impose and collect license fees upon the employment and businesses mentioned in this section.

(b) Grant or deny applications for licenses and impose conditions, limitations and restrictions upon the licensee.

(c) Adopt, amend and repeal regulations relating to licenses and licensees.

(d) Restrict, revoke or suspend licenses for cause after hearing. In an emergency the board may issue an order for immediate suspension or limitation of a license, but the order must state the reason for suspension or limitation and afford the licensee a hearing.

4. The license board shall hold a hearing before adopting proposed regulations, before adopting amendments to regulations, and before repealing regulations relating to the control or the licensing of the employment or businesses mentioned in this section. Notice of the hearing must be published in a newspaper published

and having general circulation in the county at least once a week for 2 weeks before the hearing.

5. Upon adoption of new regulations the board shall designate their effective date, which may not be earlier than 15 days after their adoption. Immediately after adoption a copy of any new regulations must be available for public inspection during regular business hours at the office of the county clerk.

6. Except as otherwise provided in NRS 241.0355, a majority of the members constitutes a quorum for the transaction of business.

7. Any natural person, firm, association of persons or corporation who engages in the employment of any of the businesses mentioned in this section without first having obtained the license and paid the license fee as provided in this section is guilty of a misdemeanor.

8. In a county whose population is 700,000 or more, the license board shall not grant any license to a petitioner for the purpose of operating a house of ill fame or repute or any other business employing any person for the purpose of prostitution.

9. As used in this section:

(a) "Entertainer for an entertainment by referral service" means a natural person who is sent or referred for a fee to a hotel or motel room, home or other accommodation by an entertainment by referral service for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

(b) "Entertainment by referral service" means a person or group of persons who send or refer another person to a hotel or motel room, home or other accommodation for a fee in response to a telephone or other request for the purpose of entertaining the person located in the hotel or motel room, home or other accommodation.

## XXXV.  N.R.S. 236.015 (Excerpt)

1. The following days are declared to be legal holidays for state, county and city governmental offices:

Fourth Thursday in November (Thanksgiving Day)

## XXXVI.  22 C.F.R. § 40.24

(a) Activities within 10 years preceding visa application. An alien shall be ineligible under INA 212(a)(2)(D) only if—

(1) The alien is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution, or the alien directly or indirectly procures or attempts to procure, or procured or attempted to procure or to import prostitutes or persons for the purposes of prostitution, or receives or received, in whole or in part, the proceeds of prostitution; and

(2) The alien has performed one of the activities listed in § 40.24(a)(1) within the last ten years.

(b) Prostitution defined. The term "prostitution" means engaging in promiscuous sexual intercourse for hire. A finding that an alien has "engaged" in prostitution must be based on elements of continuity and regularity, indicating a pattern of behavior or deliberate course of conduct entered into primarily for financial gain or for other considerations of material value as distinguished from the commission of casual or isolated acts.

(c) Where prostitution not illegal. An alien who is within one or more of the classes described in INA 212(a)(2)(D) is ineligible to receive a visa under that section even if the acts engaged in are not prohibited under the laws of the foreign country where the acts occurred.

(d) Waiver of ineligibility—INA 212(h). If an immigrant visa applicant is ineligible under INA 212(a)(2)(D) but is qualified to seek the benefits of INA 212(h), the consular officer shall inform the alien of the procedure for applying to DHS for relief

under that provision of law. A visa may not be issued to the alien until the consular

officer has received notification from DHS of the approval of the alien's application

under INA 212(h).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 3:19-cv-00107-MMD-WGC

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Russell Greer
P.O. Box 152
West Jordan, Utah 84088;
Gus Flangas
3275 South Jones Boulevard, Suite 105
Las Vegas, Nevada 89146

**Description of Document(s)** *(required for all documents)*:

APPELLANTS' OPENING BRIEF

**Signature** | s/Bernadette Francis | **Date** | Mar 4, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                 *Rev. 12/01/2018*